**FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000324
20-DEC-2023
08:01 AM
Dkt. 201 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---

**NO. CAAP-17-0000324**
FAUSTINO DASALLA DOMINGO and ELTON LANE NAMAHOE, SR.,
Plaintiffs-Appellees/Cross-Appellees,
v.
JAMES B. NUTTER & COMPANY,
Defendant-Appellant/Cross-Appellee,
and
ROBERT M. EHRHORN, JR.; CLAY CHAPMAN IWAMURA PULICE & NERVELL,
Attorneys at Law, a Law Corporation,
Defendants-Appellees/Cross-Appellants,
and
JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10;
DOE CORPORATIONS 1-10; DOE ENTITIES 1-10 and
DOE GOVERNMENTAL UNITS 1-10, Defendants

_____

**NO. CAAP-17-0000859**
FAUSTINO DASALLA DOMINGO and ELTON LANE NAMAHOE, SR.,
Plaintiffs-Appellants/Cross-Appellees,
v.
JAMES B. NUTTER & COMPANY,
Defendant-Appellee/Cross-Appellee,
and
ROBERT M. EHRHORN, JR.; CLAY CHAPMAN IWAMURA PULICE & NERVELL,
Attorneys at Law, a Law Corporation,
Defendants-Appellees/Cross-Appellants,
and
JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10;
DOE CORPORATIONS 1-10; DOE ENTITIES 1-10 and
DOE GOVERNMENTAL UNITS 1-10, Defendants

NOS. CAAP-17-0000324 and CAAP-17-0000859

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 16-1-0249)

DECEMBER 20, 2023

GINOZA, CHIEF JUDGE, LEONARD AND NAKASONE, JJ.

OPINION OF THE COURT BY LEONARD, J.

This consolidated appeal concerns wrongful-foreclosure-related claims brought in Civil No. 16-1-0249 by Plaintiffs-Appellees/Cross-Appellees/Appellants Faustino Dasalla Domingo (**Domingo**) and Elton Lane Namahoe, Sr. (**Namahoe**) (collectively, **Plaintiffs**) against Defendant-Appellant/Cross-Appellee/Appellee James B. Nutter & Company (**Nutter**), as well as related claims brought against Nutter's attorneys.

In *CAAP-17-0000324*, Nutter appealed from the March 6, 2017 Order Denying [Nutter's] Motion for Judgment on the Pleadings as to Plaintiffs' Complaint filed July 5, 2016 (**Order Denying Nutter MJOP**), entered by the Circuit Court of the Third Circuit (**Circuit Court**).[1]  Nutter later moved to dismiss its appeal from the Order Denying Nutter MJOP.  On January 25, 2019, this court entered an order granting Nutter's motion and dismissing its appeal with prejudice.

In *CAAP-17-0000324*, Defendants-Appellees/Cross-Appellants/Appellees Robert M. Ehrhorn, Jr. (**Ehrhorn**) and Clay Chapman Iwamura Pulice & Nervell Attorneys at Law, a Law

---

[1]    The Honorable Greg K. Nakamura presided.

2

Corporation, (**Clay Chapman**) (collectively, **Attorney Defendants**) cross-appeal from:  (1) the Order Denying Nutter MJOP; (2) the March 6, 2017 Order Denying [Attorney Defendants'] Substantive Joinder to [the Nutter MJOP]; and (3) the March 6, 2017 Order Denying [Attorney Defendants'] MJOP (**Order Denying Attorney Defendants' MJOP**).

In *CAAP-17-0000859*, Plaintiffs appeal from the November 15, 2017 Final Judgment on Order Granting Plaintiffs' Motion for HRCP 54(b) Certification of (1) Decision and Order on [Attorney Defendants'] Motion to Dismiss Plaintiffs' Complaint with Prejudice, . . . and (2) Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment Number One Against [Nutter and Attorney Defendants] (**HRCP Rule 54(b) Judgment**) entered by the Circuit Court.  Plaintiffs also challenge (or appeal from) the following three orders:  the December 15, 2016 Decision and Order on [Attorney Defendants'] Motion to Dismiss Plaintiffs' Complaint with Prejudice (**Partial Dismissal Order**); the March 6, 2017 Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment Number One Against [Nutter] and [Attorney Defendants] (**Order Granting/Denying MPSJ**); and the October 19, 2017 Order Granting [Plaintiffs'] Motion for HRCP 54(b) Certification of (1) the [Partial Dismissal Order]; and (2) the [(Order Granting/Denying MPSJ] (**Order Granting HRCP Rule 54(b) Certification**).

In *CAAP-17-0000859*, Attorney Defendants cross-appeal from the HRCP Rule 54(b) Judgment.  Attorney Defendants challenge:  (1) the Partial Dismissal Order; (2) the Order

Granting/Denying MPSJ; and (3) the Order Granting HRCP 54(b) Certification.

Notably, on March 31, 2023, the Hawaiʻi Supreme Court issued an opinion in a closely-related case, <u>James B. Nutter & Co. v. Namahoe</u>, 153 Hawaiʻi 149, 528 P.3d 222 (2023) (generally referred to as the **Namahoe Appeal**).[2] Of significance here, the supreme court held that Namahoe was entitled to relief from the foreclosure judgment against him on two grounds, including that Nutter and its attorneys, Attorney Defendants herein, committed fraud on the court in the foreclosure action against Namahoe's home. <u>Id.</u> at 153, 528 P.3d at 226.

Here, in sum, we hold that: (1) the Circuit Court did not err in concluding that Plaintiffs' action against Attorney Defendants was not a strategic lawsuit against public participation (**SLAPP**) filed in violation of Hawaii Revised Statutes (**HRS**) Chapter 634F (2016) (repealed 2022); (2) this court has appellate jurisdiction to review the Partial Dismissal Order, but not the Order Granting/Denying MPSJ; and (3) the Circuit Court erred in part in granting the Partial Dismissal Order. In doing so, we further hold that: (1) the litigation privilege is not an absolute bar against an action by a borrower against a foreclosing lender's attorney arising out of the attorney's fraud on the court in a prior foreclosure action; (2) a private cause of action against an attorney for committing a fraud on the court through an egregious, legally and factually

---

[2] We take judicial notice of the court records in the Namahoe Appeal, in accordance with Hawaiʻi Rules of Evidence (**HRE**) Rule 201 (1993), as well as rely on the court's opinion.

deficient, inaccurate and incomplete, materially false and misleading HRS § 667-17 affirmation, with respect to a foreclosure on a reverse mortgage, is hereby recognized; (3) a wrongful foreclosure claim *per se* is not cognizable against a lender's attorney, even though certain wrongful-foreclosure-related claims may lie against the attorney for the attorney's own wrongful conduct in limited circumstances; (4) the litigation privilege bars Plaintiffs' claims for intentional infliction of emotional distress (**IIED**) in this case, but does not in every circumstance shield attorneys from defending a claim that they intentionally acted to defraud elderly borrowers out of their homes; (5) although we recognize Plaintiffs' cause of action against Attorney Defendants for committing a fraud on the court through an egregious, legally and factually deficient, inaccurate and incomplete, materially false and misleading HRS § 667-17 affirmation under the circumstances of this case, the Circuit Court did not err in dismissing Plaintiffs' additional fraud claims without prejudice; and (6) although Domingo and Namahoe are consumers based on their reverse mortgages with Nutter, and thus are consumers *vis à vis* Attorney Defendants, we decline to recognize a claim against Attorney Defendants pursuant to HRS chapters 480 and 481A here.

I.    RELEVANT BACKGROUND

On July 5, 2016, Domingo and Namahoe filed a complaint against Nutter and Attorney Defendants asserting the following thirteen counts (the **Complaint**):  (I) & (II) legal malpractice and gross legal malpractice (against Attorney Defendants only);

(III) breach of fiduciary duty; (IV) wrongful foreclosure; (V) intentional infliction of emotional distress (**IIED**); (VI) unfair and deceptive trade practices (**Chapters 480 and 481A Claims** or **UDAP Claims**); (VII) abuse of process; (VIII) fraud (which the Circuit Court construed as including fraud on the court); (IX) fraud in the inducement (against Nutter only); (X) elder abuse; (XI) a prayer for injunctive relief (against Nutter only); (XII) slander of title; and (XIII) punitive damages.

The Complaint states factual allegations relating to two separate underlying foreclosure actions undertaken by Nutter, through then-counsel Attorney Defendants, against Domingo and Namahoe, respectively.

A.    The Allegations Regarding the Domingo Foreclosure

With respect to Domingo, the Complaint alleges that on December 11, 2007, Domingo executed an Adjustable Rate Note (**Domingo Note**), Home Equity Conversion Loan Agreement (**Domingo Loan Agreement**), with an attached Repair Rider to Loan Agreement (**Domingo Repair Rider**), and an Adjustable Rate Home Equity Conversion Mortgage (**Domingo Reverse Mortgage**), which was assigned to Nutter on the same day.  The Domingo Repair Rider contained a provision requiring Nutter to set aside $24,000 from the initial principal limit to be used for certain required repairs.[3]  The Complaint alleges that on November 3, 2009, nearly

---

[3]    The Domingo Repair Rider provided, in relevant part:

I.    Lender's Promises

    A.    The Lender [Nutter] shall set aside $24,000.00 from the initial Principal Limit under the Loan Agreement to be used for the purpose of bringing
(continued...)

two years after Domingo executed the Domingo Reverse Mortgage, Nutter first communicated by letter to Domingo regarding the repairs identified in the Domingo Repair Rider, asking to be advised of the progress to date and to complete the required repairs as soon as possible, if not already completed. Domingo advised Nutter via letter on or about December 7, 2009, that he had completed and paid for the required repairs and requested the $24,000 set aside to complete additional upgrades in progress.

The Domingo Loan Agreement provided that if the mortgagor failed to make the repairs, the reverse mortgage lender could access the property to make the repairs utilizing the funds withheld to make the repairs, and that foreclosure was *not permitted* under the "standard reverse mortgage" *unless* "the Loan Agreement was recorded contemporaneously with the Reverse Mortgage." The United States Department of Housing and Urban Development (**HUD**) regulations and best practices "prohibited foreclosure as a remedy for failure to timely repair, especially where funds were withheld from loan proceeds for repairs." Nevertheless, on April 19, 2012, through Attorney Defendants, Nutter filed a foreclosure complaint against Domingo, based solely on Domingo's alleged failure to timely make the repairs required per the Domingo Loan Agreement and Domingo Repair Rider.

---

(...continued)

the Property up to the property standards required by the [HUD] Secretary by repairing:

Peeling/Scraping Paint, Roof Repair/Replacement, General Cleanup, Replace Stove/Hood, Toilet Inspection/Repair, Cabinet Repair, Hot Water Heater Insp[ection]/Repair.

Nutter filed a motion for summary judgment, which Domingo opposed, arguing that Nutter did not have a legal right to foreclosure under these circumstances. Specifically, Domingo argued that foreclosure was not a remedy for failure to timely repair where, as was the case here, the loan agreement (containing the repair rider) was not simultaneously recorded with the reverse mortgage; where Nutter held reserves to pay for said repairs; where the repairs were so "manini", *i.e.* inconsequential, as to not constitute a substantial breach of contract; and where HUD regulations prohibited foreclosure as a remedy. Nutter's motion for summary judgment was denied.

The Complaint further alleges that Domingo, through counsel William J. Rosdil (**Rosdil**),[4] contacted Nutter and Attorney Defendants to request that they stipulate to a HUD-approved inspection of Domingo's property to determine if all of the required repairs had been completed. Neither Nutter nor Attorney Defendants agreed to the inspection. Nevertheless, Rosdil "contacted a HUD approved inspector who made the inspection and approved not only the repairs but the overall condition of the [Domingo] residence." Upon notification of the inspection, Attorney Defendants "conceded [that] Domingo was due the $24,000 refund [set aside in the Repair Rider] and not in default." However, Nutter allegedly "refused to acknowledge [that] Domingo had satisfactorily completed the repairs per HUD inspection and was not now or ever in default[.]"

---

[4] Domingo was self-represented until December 29, 2013.

On August 7, 2014, Domingo moved for summary judgment on Nutter's foreclosure complaint, for an award of $24,000, and for attorney's fees and costs, arguing, *inter alia*, that he completed the required repairs, and that, even if he had not, failure to do so would not, as a matter of law, give Nutter a legal right to accelerate the Domingo Note and seek foreclosure.

On November 14, 2014, the Circuit Court granted summary judgment in favor of Domingo, dismissing Nutter's foreclosure complaint with prejudice and ordering Nutter to pay Domingo the $24,000 set aside, as well as attorney's fees. The court concluded that Nutter was unable to show default under the terms of the Domingo Loan Agreement and that there was no genuine issue of material fact precluding summary judgment in favor of Domingo. Judgment was entered on January 15, 2015.[5]

The Complaint further alleges that despite the foregoing judgment being entered in favor of Domingo, Nutter and/or Attorney Defendants notified Domingo by mail on or about February 26, 2015, that he remained in default for non-payment of $6,674 and threatened Domingo with foreclosure if Domingo did not sign a Repayment Plan Agreement for monthly repayments of $278.08.[6] Plaintiffs allege that this default notice did not disclose that Nutter's claims had been dismissed with prejudice

---

[5]    A second judgment was entered on February 4, 2015, concerning the Circuit Court's award of attorney's fees and costs.

[6]    Plaintiffs allege that Nutter was directed by Rosdil on two separate occasions to "communicate with Domingo through Rosdil only, and to send Domingo's $24,000.00 [judgment award] through Rosdil[.]" Nevertheless, the Complaint states that on or about February 24, 2015, Nutter and/or Attorney Defendants mailed the $24,000 check to Domingo directly without advising Rosdil.

and that Domingo did not "appreciate the same." Domingo signed the Repayment Plan Agreement "under duress, fear and serious emotional distress caused by the continued threat of foreclosure and years of litigation."[7]

Thereafter,[8] the Circuit Court entered an August 10, 2015 Amended Judgment Superceding Judgments (**Amended Judgment**), which made clear that all claims for foreclosure in Nutter's complaint were dismissed with prejudice and expressly directed judgment in favor of Domingo for the $24,000 repair set aside and $39,179.24 in attorney's fees and costs.[9] On September 4, 2015, Nutter appealed the Amended Judgment in CAAP-15-0000659. Domingo cross-appealed, arguing that the Circuit Court abused its discretion in refusing to impose sanctions on Nutter.

Upon review, we concluded that Nutter did not provide any evidence showing that Domingo failed to comply with the terms of the Domingo Repair Rider. We also upheld the Circuit Court's conclusion that the entry of final judgment on Nutter's complaint before Domingo's Hawaii Rules of Civil Procedure (**HRCP**) Rule 11 motion was filed precluded the Circuit Court from entering

---

[7] Upon notifying Rosdil of the letter, Domingo abrogated the payment contract.

[8] On April 24, 2015, Domingo filed an HRCP Rule 11 motion for sanctions against Nutter and Attorney Defendants based on the filing and prosecution of the foreclosure complaint. The court denied the motion on procedural grounds, finding that the summary judgment entered in favor of Domingo and against Nutter resolved the challenged conduct. Domingo then filed a motion to correct/reconsider the order denying the HRCP Rule 11 motion, which the court also denied.

[9] On May 1, 2015, Nutter moved for correction and/or reconsideration per HRCP Rules 54, 58, 60(a), and 60(b) of the judgments granting Domingo's motion for summary judgment and for attorney's fees and costs. Although the motion was granted in part and denied in part, the August 10, 2015 Amended Judgment is essentially identical in substance to the earlier judgments in favor of Domingo.

sanctions against Nutter. We therefore affirmed the trial court's rulings.

Finally, Plaintiffs alleged that Nutter continues to threaten Domingo with foreclosure, and that Nutter's conduct is intended to cause Domingo anxiety and worry and to hasten his demise, and that Nutter has been successful. Domingo has been hospitalized about four times since Nutter's first post-judgment threat to foreclose again and/or render Domingo in default. The Complaint states that on June 14, 2016, through different counsel, Nutter again filed for foreclosure against Domingo, and "[t]he pleading and affirmation of counsel are intentionally vague and ambiguous but certainly frivolous, fraudulent, elder abuse, and wrongful foreclosure."

B.    The Allegations Regarding the Namahoe Foreclosure

The allegations regarding Nutter's foreclosure action against Namahoe mirror in many respects those regarding Nutter's foreclosure against Domingo, the main differences being that Namahoe's alleged repair failure was for only $500 worth of repairs, and Namahoe failed to defend himself in the case. Namahoe lost his home.

On October 19, 2009, Namahoe executed a promissory note in favor of Nutter and its successors and assigns (**Namahoe Note**), along with a Home Equity Conversion Loan Agreement (**Namahoe Loan Agreement**) and an attached Repair Rider to Loan Agreement

(**Namahoe Repair Rider**).[10]  The exhibits to the Namahoe Note indicated that the "principal limit" was $67,536.00, with Namahoe receiving an "advance" of $52,462.48, with a $750.00 "line of credit" designated for repairs, and the balance of the $67,536.00 going to closing costs and servicing fee set asides.  The Namahoe Note was secured by a Home Equity Conversion Mortgage (**Namahoe Reverse Mortgage**).

On March 6, 2012, Nutter filed a foreclosure complaint and summons against Namahoe, also naming HUD.[11]  The complaint alleged that Namahoe "defaulted in the observance and performance of the terms, covenants and conditions by failing to repair the property as required by the [Namahoe Repair Rider] in a timely manner."  The complaint further alleged that Namahoe was given written notice that failure to timely repair per the Namahoe Repair Rider "required immediate payment in full of all outstanding principal and accrued interest due on the loan," and that Namahoe failed to so pay.

On May 20, 2013, Nutter filed a Motion for Summary Judgment and Decree of Foreclosure Against All Defendants on

---

[10]  The Namahoe Repair Rider provided, *inter alia*:

I.  Lender's Promises
A.  The Lender shall set aside $750.00 from the initial Principal Limit under the Loan Agreement to be used for the purpose of bringing the Property up to the property standards required by the Secretary by repairing: The hall and carport ceiling shows evidence of water stains due to roof leak.  The Front stair rail showed evidence of water rot.  All to be repaired.

[11]  On June 28, 2012, HUD filed a disclaimer of interest in the Property.

Complaint Filed March 6, 2012.[12]  The memorandum in support of the motion stated, *inter alia*:

> [Namahoe] defaulted in the observance and performance of the terms, covenants and conditions by failing to repair the property, as required by the [Namahoe Repair Rider], in a timely manner.  A true and correct copy of the approval by [HUD] for immediate payment in full of all outstanding principal and accrued interest as required by paragraph 7(b)(iii) of the Note is attached hereto. . . .  Written notice was given to [Namahoe] that because of the failure to repair the property as required by the [Namahoe Repair Rider] in a timely manner [Nutter] required immediate payment in full of all outstanding principal and accrued interest due on the loan.  A true and correct copy of this notice with all personal and confidential information redacted is attached hereto. . . .  However, despite said notice the default was not cured and the loan has not been paid off.  Consequently, [Nutter] exercised its option under the terms and covenants of the Note and Mortgage to declare the entire unpaid principal balance of the loan, together with interest immediately due and payable[.][13]

On June 25, 2013, a one-minute hearing was held on Nutter's motion for summary judgment, with Nutter's attorney appearing by telephone and no other appearances noted; the motion was granted.  On July 2, 2013, the Circuit Court entered the Findings of Fact, Conclusions of Law and Order Granting [Nutter's] Motion for Summary Judgment and Decree of Foreclosure Against All Defendants on Complaint Filed March 6, 2012 (**Order**

---

[12]  According to the attached certificate of service, the motion for summary judgment and the notice of hearing were mailed to Namahoe at the subject property.  Based on an August 28, 2012 filing by Nutter, it does not appear that the U.S. Postal Service delivers mail to the physical location of the subject property.  The notice of hearing stated that a hearing would be held at 8:30 a.m. in the Circuit Court's courtroom at 777 Kilauea Avenue, in Hilo; no hearing date was included in the Notice of Hearing, although a date was written on the first page of the Motion for Summary Judgment.  A November 16, 2011 Notice of Intent to Foreclose and an April 6, 2012 debt collection notice, both attached in support of the motion, indicated that they were mailed to Namahoe's post office box in Hilo, rather than the subject property's physical address.

[13]  With the motion for summary judgment, Ehrhorn submitted an affirmation pursuant to HRS § 667-17 (2016) (repealed 2017) stating that he was "fully aware" of the underlying action and that based, *inter alia*, "upon [his] own inspection and other reasonable inquiry" to the best of his knowledge, information, and belief, the motion contained no false statements of fact or law, that he understood his continuing obligation to amend the affirmation in light of newly discovered material facts, and that the allegations in the motion were warranted by existing law and have evidentiary support.

**Granting Summary Judgment**), as well as a Judgment on the Order Granting Summary Judgment (**Foreclosure Judgment**).

On July 24, 2013, Foreclosure Commissioner Michael W. Moore (**Moore**) filed a Motion for Leave to Waive Open Houses. The attached Declaration states:

> 2.  On July 18, 2013, I visited the subject property in Hawaiian Acres. . . .  I knocked on the front door, but there was no response. . . .  It appeared that someone was residing in the house.
>
> 3.  . . . I found Defendant Namahoe's telephone number in the phone book and called.  Mr. Namahoe answered.  <u>He seemed unaware there was a foreclosure proceeding against him</u>.  He said he is 70 years old, has no car, so he can't check his post office box in Hilo where he receives his mail.  He told me no one can take his house because he owns it.  I explained to him it was my responsibility to sell his property at public auction.
>
> 4.  He became quite upset.  He said he has nowhere else to live, no family or friends he can stay with.  He said his income is only $700 a month, and he can barely afford to buy food.  He told me that he would shoot the next person to come to his house so he could go to jail and get fed.
>
> 5.  Based on these circumstances, I believe Mr. Namahoe will not cooperate in conducting open houses of the property, and that any person who attempts to enter his home would risk injury, possibly serious injury.

(Emphasis added).

Also on July 24, 2013, Moore mailed a Notice of Hearing to Namahoe's Hilo post office box.  The Circuit Court's October 2, 2013 Order Granting Commissioner's Motion for Leave to Waive Open Houses states that the motion "came on for hearing before this Court on August 29, 2013, with the Commissioner present and [Nutter] having filed a statement of no opposition . . . and no other parties appearing."

The Commissioner's Report on Sale of Property indicates that the property was sold at public auction on November 13, 2013, with the highest bid being presented by Nutter.  The

attached certificate of service, dated November 25, 2013,

contains the following addendum:

> *NOTE: We do not have a current mailing address for [Namahoe]. His last known mailing address was P.O. Box 4686, HILO HI 96721. By return mail notice dated 10/4/13, the U.S. Postal Service advised that Mr. Namahoe's post office box has been closed and they are unable to forward his mail.*

On February 11, 2014, the Circuit Court entered an

Order Approving Report of Commissioner, Confirming Commissioner's

Sale of Property at Public Auction, Directing Distribution of

Proceeds and for a Writ of Ejectment, along with a corresponding

Judgment, Writ of Ejectment, and Notice of Entry (**Confirmation

Judgment**).  A Return of Service as to Writ of Ejectment was filed

on June 23, 2014, indicating personal service on Namahoe.

Approximately two and a half years later, on January 3,

2017, Namahoe filed an HRCP Rule 60(b) Motion for Relief from

[Foreclosure Judgment] (**Rule 60(b) Motion**).  The motion

challenged the substantive basis for the foreclosure, averring

that Nutter was not entitled to pursue a reverse mortgage

foreclosure based upon failure to timely repair, and further,

that Namahoe made the repairs set forth in the Namahoe Repair

Rider but that, although he recalled two separate inspections of

the Property by Nutter's agents, neither inspector checked the

repairs to the roof and neither indicated there was any problem

with the repairs.

The Rule 60(b) Motion and Namahoe's attached

Declaration also challenged whether Namahoe had notice of the

foreclosure proceedings, stating, *inter alia*:

> 7.    I do not remember the sheriff, [Estacion] handing me the foreclosure Complaint on November 9, 2012.

> Not [sic] do I recall signing any paper that I received the Complaint. I would not have understood it anyway.
>
> 8. My first memory about the foreclosure was a telephone call from an attorney who said he wanted to inspect my house and property because it was his job to sell my house at a foreclosure action. I was shocked! I did not know of any foreclosure. How come no one wrote me, telephoned me, or came to the house. I was always there because I had no car, very little money and only a few neighbors and relatives. I had to hitch rides from my house in remote Hawaiian Acres to shop for food and collect my mail at my post office box in Hilo. I was angry and upset and never heard again from the attorney.

In the Rule 60(b) Motion, Namahoe further argued that Nutter committed fraud and fraud upon the court in pursuing the improper foreclosure, and requested the court take judicial notice of the records and files in the separate allegedly improper foreclosure proceedings brought by Nutter against Domingo, as well as the records and files in Civil No. 16-1-0249, the Circuit Court case underlying the instant appeal.

Nutter opposed the Rule 60(b) Motion, arguing that: (1) it was untimely and Namahoe failed to establish a meritorious claim or defense; (2) Namahoe's fraud allegations were unsupported; (3) the Foreclosure Judgment was not void; (4) Namahoe waived all claims against Nutter related to the foreclosure in exchange for $5,000; and (5) the Property had already been sold to a third party. Namahoe filed a reply to Nutter's opposition, contesting Nutter's first four arguments.

A hearing on the Rule 60(b) Motion was held on February 28, 2017, wherein the Circuit Court orally denied the motion. The Circuit Court explained its ruling:

> [T]he Court will deny the motion to the extent that the motion proceeds under Rule 60(b)(3), [because] the motion is untimely. More than one year passed between the

> time the Judgment was filed on July 2nd, 2013, and the filing of the [Rule 60(b) Motion].
> To the extent that proceeding under Rule 60(b)(4), the motion is denied. If we're talking about the notice issue, Mr. Namahoe did not answer and provide a mailing address. And if you look at the note and mortgage, all notices were to be given by mail to that 16-2218 Opeapea Road in Kurtistown unless Mr. Namahoe designated otherwise. And there's no indication that he designated another address to the lender.
> Regarding the fraud on the court type theories I'm going to think that that's more properly addressed in Civil number 16-1-249. I see that case as being that independent action that's mentioned under Rule 60(b). And my impression is that independent action is not really a 60(b) type motion.
> There's still a fraud on the court type claim for relief by Mr. Namahoe against Clay Chapman. And Mr. Namahoe would have at least the opportunity to attempt to amend the pleadings in that case to state, let's say, clear claims for relief against Nutter. So that's what the Court's belief is.

Namahoe's attorney asked if the court's ruling was with prejudice, and the court replied:

> On the (b)(3), (b)(4), I think so.
> But the [fraud on the] court stuff [14] is still out there; right, in your other action. Cause you still have -- I think Mr. Namahoe still has a claim for relief against Nutter -- not Nutter -- Clay Chapman. And then you have the opportunity to amend. I'm thinking that you already have that action already, you know, so it's not as if you needed this action to address the [fraud on the] court issue[.]

On April 5, 2017, the Circuit Court entered the Order Denying Rule 60(b) Motion.

On April 13, 2017, Namahoe filed an HRCP Rule 59(a) & (e) Motion for Amendment/Additional Evidence/Reconsideration of [Order Denying Rule 60(b) Motion]. Nutter opposed the motion. On June 9, 2017, the Circuit Court entered an order denying reconsideration.

Namahoe timely filed a Notice of Appeal to this court (the **ICA**). We affirmed. Namahoe filed a petition for writ of certiorari to the supreme court, which was accepted and which

---

[14] The transcript reads "form of court stuff," but in context, it is clear that the Circuit Court was referring to Namahoe's assertion that there had been a fraud on the court.

resulted in the Namahoe Appeal, which is discussed at length herein. In short, the supreme court affirmed the ICA's decision with respect to Namahoe's requests for relief under HRCP Rule 60(b)(3) and (4), but held that Namahoe was entitled to relief under HRCP Rule 60(b)(6). Namahoe, 153 Hawaiʻi 149, 528 P.3d 222.

C. Other Relevant Proceedings Below

1. *Attorney Defendants' Motion to Dismiss*

On July 27, 2016, Attorney Defendants filed a Motion to Dismiss Plaintiffs' Complaint with Prejudice (**Motion to Dismiss**), arguing that: (1) they owe no duty of care or fiduciary duty to Plaintiffs that could give rise to liability for legal malpractice or breach of fiduciary duty; (2) the litigation privilege provides them with immunity for legal malpractice, breach of fiduciary duty, wrongful foreclosure, intentional infliction of emotional distress, and elder abuse; (3) Plaintiffs failed to allege a claim for abuse of process because the Complaint did not allege "willful acts" distinct from the use of process; (4) Plaintiffs failed to allege a claim for fraud because the Complaint failed to allege detrimental reliance or, in the case of Domingo, substantial pecuniary damage; (5) Plaintiffs failed to allege a claim for violation of HRS Chapter 481A because the Complaint did not allege conduct that would likely lead to confusion or misunderstanding; and (6) Plaintiffs lacked the consumer standing required to bring a claim under HRS Chapter 480.

Attorney Defendants further argued that because the claims against Ehrhorn fail to state a claim for relief, any and all allegations of *respondeat superior* liability against Clay Chapman must be dismissed with prejudice, and, similarly, that Plaintiffs had no cause of action on which to premise a request for punitive damages.

Plaintiffs raised numerous arguments in opposition to the Motion to Dismiss, and Attorney Defendants filed a reply memorandum.

Following a September 29, 2016 hearing, on December 15, 2016, the Circuit Court entered the Partial Dismissal Order. The Partial Dismissal Order dismissed Counts I, II, III, IV, V, VI, VII, VIII (only in part), X, and XIII of the Complaint without prejudice, as well as dismissed Count XII of the Complaint with prejudice.[15] The Partial Dismissal Order is discussed further in Section IV.B.2. and IV.C. below.

2. *Plaintiffs' Motion for Partial Summary Judgment*

On August 24, 2016, Plaintiffs filed a Motion for Partial Summary Judgment Number One Against [Nutter and Attorney Defendants] (**MPSJ**), seeking a determination that, as a matter of law, Nutter did not have the right to foreclosure on either Domingo or Namahoe for failure to timely make the required repairs. Plaintiffs argued that Nutter was prevented from seeking foreclosure by the terms of the loan documents, the HUD mortgage loan servicing handbook, and Nutter's own reverse mortgage manual.

---

[15]     Counts IX and XI state claims against Nutter only.

19

Nutter and Attorney Defendants filed oppositions to the Motion for Partial Summary Judgment. On March 6, 2017, the court entered the Order Granting/Denying MPSJ, granting the MPSJ as to Domingo and denying it as to Namahoe. For the reasons set forth in Section IV.B.1. below, we conclude that we lack appellate jurisdiction to review the Order Granting/Denying MPSJ.

D.    Attorney Defendants' Anti-SLAPP Motion

On November 23, 2016, Attorney Defendants filed a motion for judgment on the pleadings "on the basis that [Plaintiffs'] claims against the Attorney Defendants represent an impermissible strategic lawsuit against public participation." Plaintiffs filed a memorandum in opposition, Attorney Defendants filed a reply memorandum, and the Circuit Court held a hearing on January 26, 2017. The Circuit Court concluded that Plaintiffs' sole surviving claim against Attorney Defendants for fraud on the court had substantial and sufficient justification to warrant denial of the motion for judgment on the pleadings. On March 6, 2017, the Circuit Court entered an Order Denying Attorney Defendants' MJOP, and the court later denied Attorney Defendants' renewed anti-SLAPP motion for judgment on the pleadings.

These appeals were timely filed.

II.  POINTS OF ERROR

In *CAAP-17-0000324*, Nutter raised three points of error, all of which contended, in one manner or other, that the Circuit Court erred in failing to conclude that this action constitutes a SLAPP filed in violation of HRS Chapter 634F (2016)

(repealed 2022).[16]  As noted above, Nutter's appeal has been dismissed with prejudice.

In *CAAP-17-0000324*, Attorney Defendants raise three points of error, contending that the Circuit Court erred in:  (1) denying their substantive joinder to Nutter's MJOP; (2) denying Attorney Defendants' MJOP, pursuant to HRS Chapter 634F; and (3) ruling that Attorney Defendants were not afforded protection by the anti-SLAPP statute, based on (a) the attorney affirmations filed by them during their representation of Nutter in the foreclosure actions against Namahoe and Domingo, and (b) the fraud on the court claim by Namahoe, which was not dismissed in the Partial Dismissal Order.

In *CAAP-17-0000859*, Attorney Defendants raise three points of error,[17] contending that the Circuit Court erred in: (1) entering the Order Granting HRCP 54(b) Certification, as the orders subject to certification did not resolve any claims; (2) entering the Partial Dismissal Order inasmuch as it denied Attorney Defendants' motion to dismiss Namahoe's claim for relief based on fraud on the court; and (3) entering the Order Granting/Denying MPSJ to the extent that it granted any relief in favor of Namahoe.

In *CAAP-17-0000859*, Plaintiffs raise two points of error, contending that the Circuit Court erred in:  (1) granting in part Attorney Defendants' Motion to Dismiss, which was filed

---

[16]     Act 96 of 2022 repealed HRS chapter 634F and instead adopted HRS chapter 634G, the Hawaii Public Expression Protection Act.

[17]     Although Attorney Defendants cross-appealed in *CAAP-17-0000859*, we address their contentions first here because they argue that this court lacks appellate jurisdiction.

pursuant to HRCP Rule 12(b)(6); and (2) denying in part Plaintiffs' Motion for Partial Summary Judgment, given that Nutter had no right to foreclose against their homes.

III. APPLICABLE STANDARDS OF REVIEW

A ruling on a motion for judgment on the pleadings pursuant to HRS § 634F, regarding SLAPP cases, is reviewed *de novo*. Perry v. Perez-Wendt, 129 Hawaiʻi 95, 98, 294 P.3d 1081, 1084 (App. 2013). Pursuant to the anti-SLAPP statute, when a motion to dispose of a purported SLAPP claim is filed, the burden of proof and persuasion rests with the non-moving party. HRS § 634F-2(4)(B) (Supp. 2012); see also Perry, 129 Hawaiʻi at 100, 294 P.3d 1086.

Statutory interpretation and the existence of jurisdiction are questions of law that are reviewed under the right/wrong standard. Deutsche Bank Nat'l Tr. Co. v. Greenspon, 143 Hawaiʻi 237, 243, 428 P.3d 749, 755 (2018).

A trial court's ruling on a motion to dismiss is reviewed *de novo*. Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawaiʻi 92, 104, 176 P.3d 91, 103 (2008).

> A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. This court must, therefore, view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternate theory. Consequently, in reviewing the circuit court's order dismissing the plaintiffs' complaint in this case, our consideration is strictly limited to the allegations of the complaint, and we must deem those allegations to be true.

Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Hawaiʻi 251, 266, 151 P.3d 732, 747 (2007) (citation and internal quotation marks omitted).

IV.   DISCUSSION

A.   Attorney Defendants' Anti-SLAPP Arguments

Attorney Defendants argue that Plaintiffs' Complaint should have been dismissed as an impermissible SLAPP, filed in violation of HRS Chapter 634F.  We conclude that Plaintiffs carried their burden of showing that their Complaint is not a SLAPP.  Namahoe and Domingo are elderly individuals who allegedly suffered injury and/or loss in conjunction with the wrongful foreclosures of the reverse mortgages on their homes.  Plaintiffs' action to seek redress was not filed in violation of HRS Chapter 634F.  The Circuit Court did not err in rejecting Attorney Defendants' arguments that this case should be dismissed as a SLAPP.[18]

HRS Chapter 634F sought to, *inter alia*, "[p]rotect and encourage citizen participation in government to the maximum extent permitted by law" and "[c]reate a more equitable balance between the rights of persons to file lawsuits and to trial by jury, and the rights of persons to petition, speak out, associate, and otherwise participate in their governments" by prohibiting strategic lawsuits against such public participation.  See 2002 Haw. Sess. Laws Act 187, § 1 at 822 (setting forth purposes of HRS Chapter 634F).  HRS § 634F-1 (2016) provided that SLAPP "refers to a lawsuit that lacks substantial justification or is interposed for delay or harassment and that is solely based on the party's public participation before a governmental body."

---

[18]   Our affirmation of the Circuit Court's SLAPP rulings is not a decision on the merits of Plaintiffs' claims against Attorney Defendants.

(Emphasis added). Attorney Defendants argue that the claims against them lack substantial justification, are based solely on their participation before a government body, and therefore, should have been dismissed under the anti-SLAPP statute.

Attorney Defendants generally contend, *inter alia*, that: every one of Plaintiffs' claims against them arise out of Nutter's foreclosures on both Namahoe's and Domingo's reverse mortgages; Nutter had a right to initiate the foreclosure actions and participate in those actions by way of giving written and/or oral testimony; and Attorney Defendants' actions in the foreclosures against Namahoe and Domingo constitute precisely the type of conduct that Hawaii's anti-SLAPP Law is designed to protect. Given the allegations in Plaintiffs' Complaint, this is an incorrect interpretation of Hawaii's anti-SLAPP law, especially in light of the supreme court's opinion in the Namahoe Appeal, as set forth below.

Attorney Defendants more specifically argue that Plaintiffs do not assert a valid claim against them because Namahoe's claim for fraud on the court is not a cause of action upon which damages may be awarded to an individual. However, as Plaintiffs note, this argument was not raised in their anti-SLAPP arguments to the Circuit Court, and therefore it is waived. See Hawaii Rules of Appellate Procedure Rule 28(b)(4); see also, e.g., Kemp v. CSEA, 111 Hawaiʻi 367, 391, 141 P.3d 1014, 1038 (2006).

Attorney Defendants next argue that Plaintiffs' fraud on the court claim lacks substantial justification because the

alleged conduct is not a sufficiently egregious or widespread fraud upon the judicial process to constitute a fraud on the court.  In the Namahoe Appeal, in the supreme court's discussion of what constitutes fraud on the court in the context of an HRCP Rule 60(b) motion, the court explained:

> Attorneys representing foreclosing lenders must verify and affirm to the court the accuracy of documents proffered by the lender/client in order to prevent unwarranted foreclosures.  HRS § 667-17.  Attorney affirmations in foreclosure proceedings are a statutory means of protecting homeowners from wrongful foreclosure, as they prevent the courts from advancing fraud by lenders in foreclosure actions.  <u>Id.</u>  According to the statutory mandate, attorneys shall file an affirmation with the court "that the attorney has verified the accuracy of the documents submitted, under penalty of perjury and subject to applicable rules of professional conduct."  <u>Id.</u>  The purpose of the statute "is to prevent unwarranted foreclosure actions on residential property by requiring an attorney who files a judicial foreclosure . . . to also submit a signed affidavit to the court . . . stating that the attorney has verified the accuracy of the document submitted."  H. Stand Comm. Rep. No. 697-14, in 2014 House Journal, at 1127.  The statute specifically notes that:
>
>> During and after August 2010, numerous and widespread insufficiencies in foreclosure filings in various courts around the nation were reported by major mortgage lenders and other authorities, including failure to review documents and files to establish standing and other foreclosure requisites; filing of notarized affidavits that falsely attest to such review and to other critical facts in the foreclosure process; and "robosignature" of documents.
>
> HRS § 667-17.
>
> Failure to submit adequate documentation, including the attorney affirmation, has been determined to be an adequate basis for denial of a motion for summary judgment.  <u>Wells Fargo Bank, N.A. v. Fong</u>, 149 Hawaiʻi 249, 252, 255–56, 488 P.3d 1228, 1231, 1234–35 (2021).  It is reasonably inferred that to require attorney affirmations is to also require them to be accurate and complete.  Anything less would render the statutory requirement meaningless.  <u>See In re City & Cnty. of Honolulu Corp. Counsel</u>, 54 Haw. 356, 373, 507 P.2d 169, 178 (1973) ("It is a cardinal rule of statutory construction that a statute ought upon the whole be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void, or insignificant."); <u>Korean Buddhist Dae Won Sa Temple of Haw. v. Sullivan</u>, 87 Hawaiʻi 217, 230, 953 P.2d 1315, 1328 (1998) (courts can consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning.") (bracket and ellipsis points in original).  **<u>Because attorney affirmations are representations to the court, an inaccurate, incomplete, or otherwise misleading HRS § 667-17 affirmation may constitute</u>**

**a misrepresentation to the court. Accordingly, an inadequate attorney affirmation may rise to the level of fraud on the court.** In these instances, relief from the Decree of Foreclosure is justified.[24]

[24] The circuit court in the Domingo and Namahoe foreclosure action in <u>Domingo v. James B. Nutter & Co.</u>, Civil No. 16-1-0249, CAAP-17-0000324, highlighted the importance of the attorney affirmation:

> If the representations contained in the affirmation required under HRS § 667-17 are not directed to the mortgagor, then to whom are they directed? Quite clearly they are directed to the Court presiding over the foreclosure case. The Court implicitly relies upon the attorney affirmation. The attorney affirmation "helps ensure that Hawaiʻi's courts are not used as instruments of fraud in foreclosure actions." Conf. Comm. Rep. No. 62-12, in 2013 House Journal, 27th Leg., Reg. Sess. at 1632 (Haw. 2013).
>
> Since the attorney affirmation contains representations to the Court, if the attorney affirmation contains misrepresentations they are misrepresentations to the Court. Sanctions and remedies may be available as a result of these misrepresentations to the Court.

Here, the attorney affirmation submitted in support of the foreclosure of Namahoe's home was inaccurate and incomplete in several respects. [Nutter] appears to have initiated foreclosure despite having knowledge that it failed to comply with the Repair Rider — the violation of which triggered the foreclosure. According to the Repair Rider attached to [Nutter's] complaint, the burden was on [Nutter] to certify "that the repairs which are funded under this Repair Rider will be completed in a manner to meet HUD property standards required by the Secretary as determined by a HUD-approved inspector." However, the record is devoid of any admissible evidence of Namahoe's alleged failure to carry out the repairs. As the ICA stated in its Memorandum Opinion, "there is no declaration or other evidence in the record of the particular repairs Namahoe allegedly failed to complete." No. CAAP-17-0000496, 2022 WL 899896 at *11 n.10 (App. March 28, 2022) (emphasis added). Furthermore, nowhere in the record does [Nutter] confirm that Namahoe's property had been inspected by a HUD-certified inspector.[25] Pursuant to the Repair Rider, [Nutter] had the independent duty to ensure that a HUD-approved inspector had inspected Namahoe's property prior to initiating foreclosure proceedings.

[25] Based on the current record, it is unknown whether any inspectors were sent to survey the state of repairs on Namahoe's property. Namahoe attests that two individuals inspected his property, but that none indicated any problems with Namahoe's repairs.

**By submitting an attorney affirmation in support of foreclosure against Namahoe, without first verifying that there was an adequate factual and legal basis for foreclosure pursuant HRS § 667-17, the attorney affirmation falsely affirmed the sufficiency of the basis for the**

> **foreclosure. This failure by [Nutter] and its attorneys supports a finding of fraud on the court.**

James B. Nutter & Co., 153 Hawaiʻi at 167-68, 528 P.3d at 240-41 (emphasis added).

The supreme court clearly rejected the argument that the alleged conduct of Attorney Defendants in the foreclosure action against Namahoe does not constitute a fraud on the court. The supreme court's ruling shows that Plaintiffs' claim for fraud in this case does not "lack[] substantial justification." See HRS § 634F-1 (definition of SLAPP). Further, the Complaint and the supreme court's opinion show that Plaintiffs' claims do not just flow from the filing of the false attorney affirmation and other pleadings in the foreclosure case, but the failure to verify – outside the participation in the court proceedings – that there was an adequate factual and legal basis for foreclosure. Indeed, Plaintiffs' allegations assert that Attorney Defendants conducted due diligence and similar responsibilities "prior to, during and subsequent to the foreclosures." Thus, the allegations in Plaintiffs' Complaint are based in part on the conduct of Attorney Defendants outside of their appearances before the court and are not "solely based on [Attorney Defendants'] public participation before a governmental body." Id. Therefore, Defendant Attorneys are not entitled to SLAPP relief based on that argument.

Domingo's claims against Nutter are similarly based on allegations of wrongful foreclosure and further claims arising, in the first instance, out of a factually and legally deficient foreclosure on the reverse mortgage on Domingo's home based on

repairs that Domingo supposedly failed to complete.  Domingo, like Namahoe, argued that, as a matter of law, Nutter did not have a legal right to foreclosure under the circumstances.

Domingo moved for summary judgment on Nutter's foreclosure complaint in Civil No. 12-1-0226, arguing, *inter alia*, that he completed the required repairs, and that even if he had not, failure to complete the repairs would not, as a matter of law, give Nutter the legal right to accelerate the subject note and seek foreclosure.  The Circuit Court granted Domingo's summary judgment motion and entered judgment in favor of Domingo, *inter alia*, dismissing the foreclosure complaint with prejudice.

The Complaint herein further alleges, *inter alia*, that despite the foregoing order and judgment thereon, Nutter and/or Attorney Defendants notified Domingo by mail on or about February 26, 2015, that he remained in default for non-payment of $6,674 and threatened Domingo with another foreclosure, if Domingo did not sign a Repayment Plan Agreement for monthly repayments and make monthly payments of $278.08.  Plaintiffs allege that this default notice did not disclose that Nutter's claims had been dismissed with prejudice and that Domingo did not "appreciate the same."  Domingo signed the Repayment Plan Agreement "under duress, fear and serious emotional distress caused by the continued threat of foreclosure and years of litigation."[19]

Thereafter, the Circuit Court entered the August 10, 2015 Amended Judgment, superceding the previous judgments, which

---

[19]    Upon notifying his counsel of the letter, Domingo abrogated the repayment contract.

made clear that all claims for foreclosure were dismissed with prejudice and expressly directed judgment in favor of Domingo for the $24,000 repair set aside and $39,179.24 in attorney's fees and costs.[20] The Circuit Court's rulings in favor of Domingo in the foreclosure action against him were affirmed on appeal in CAAP-15-0000659.

Although ultimately Domingo did not end up losing his home to foreclosure, it appears that by submitting an egregiously inaccurate and incomplete, materially false and misleading, attorney affirmation in support of the foreclosure action against Domingo, without first verifying that there was an adequate factual and legal basis for foreclosure pursuant to HRS § 667-17, Attorney Defendants fraudulently affirmed the sufficiency of the basis for the foreclosure. This egregious failure to comply with HRS § 667-17, facilitated an unwarranted foreclosure action against Domingo. Thus, Plaintiffs' Complaint does not "lack[] substantial justification," and it is not "solely based on [Attorney Defendants'] public participation before a governmental body." See HRS § 634F-1. We conclude that Defendant Attorneys are not entitled to SLAPP relief based on Domingo's action to seek redress.

Attorney Defendants next argue that Plaintiffs' Complaint against them lacks substantial justification because Namahoe's claims are barred by res judicata and collateral estoppel in light of the judgment on the merits in favor of

---

[20] This judgment was later modified, but the substance of it was undisturbed.

Nutter and against Namahoe in the foreclosure action (Civil No. 12-1-0113).  However, the supreme court vacated the Foreclosure Decree insofar as it would preclude Namahoe from asserting a wrongful foreclosure claim against Nutter.  James B. Nutter & Co., 153 Hawaiʻi at 153, 166-69, 528 P.3d at 226, 239-42.  We conclude that the vacated judgment is not a bar to claims against Defendant Attorneys, and therefore, we reject the argument that Plaintiffs' Complaint against them lacks substantial justification because Namahoe's claims are barred by res judicata and collateral estoppel.

Finally, Attorney Defendants argue that the supreme court's decision in Hungate v. Law Office of David B. Rosen, 139 Hawaiʻi 394, 391 P.3d 1 (2017),[21] bars all direct claims against a mortgagee's attorney for wrongful foreclosure, and as a result, Plaintiffs' Complaint lacks substantial justification under HRS chapter 634F.  We conclude that Hungate is distinguishable, and this argument is without merit.

Attorney Defendants specifically argue that Hungate bars *all* HRS § 480-2 claims against the lender's attorney in the context of foreclosure cases.  However, the supreme court's decision was based on the specific allegations against the mortgagee's attorney in that case (**Rosen**), and set forth examples of circumstances beyond that decision.  The supreme court stated, *inter alia*:

> In contrast [to the role of a real estate broker], the role of an attorney involves representing a client's interests against those of an opposing party within an

---

[21]    Hungate was abrogated on other grounds by State ex rel. Shikada v. Bristol-Myers Squibb Co., 152 Hawaiʻi 418, 526 P.3d 395 (2023).

adversary system. Attorneys bear a duty to zealously represent clients **"within the bounds of the law**." Giuliani v. Chuck, 1 Haw. App. 379, 384, 620 P.2d 733, 737 (1980); see also Hawaiʻi Rules of Professional Conduct, "Preamble," ¶ 2; ¶ 8; ¶ 9.[22]  In other settings, we have declined to recognize a duty in favor of a plaintiff adversely affected by an attorney's performance of legal services on behalf of the opposing party.  In Boning, we noted that "creation of a duty in favor of an adversary of the attorney's client would create an unacceptable conflict of interest.  Not only would the adversary's interests interfere with the client's interests, the attorney's justifiable concern with being sued for negligence would detrimentally interfere with the attorney-client relationship."  Boning, 114 Hawaiʻi at 220, 159 P.3d at 832.

[22]   Our desire to avoid creating unacceptable conflicts of interest in this context, to protect attorney-client counsel and advice from the intrusion of competing concerns, and to allow adequate room for zealous advocacy, does not encompass, **for example**, allowing attorneys to conduct patently illegal activities on behalf of clients.

Permitting a party to sue his or her opponent's attorney for UDAP under HRS § 480-2 in foreclosure actions presents a similar issue in that an attorney's concern with being sued by a party opponent could compromise his or her representation of the client.  In a UDAP action, an attorney would be especially vulnerable to suit because, for example, under HRS § 480-2 "actual deception need not be shown; the capacity to deceive is sufficient."  Keka, 94 Hawaiʻi at 228, 11 P.3d at 16 (emphasis added) (citations omitted). Accordingly, a plaintiff would need only to allege that opposing counsel has breached the statutory duty under HRS § 480-2 "not to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . in a way that caused private damages[ ] in order to state a claim under" HRS chapter 480.  Compton, 761 F.3d at 1056.  Given that UDAP lacks a more rigorous or precise state of mind requirement, "even a carefully rendered opinion could, if incorrect, have the capacity to deceive."  Short v. Demopolis, 103 Wash.2d 52, 691 P.2d 163, 172 (1984) (Pearson, J., concurring).  The attorney would therefore "have to insure the correctness of his [or her] opinions and strategies," rendering it "virtually impossible for an attorney to effectively perform the traditional role of legal counselor."  Id.  Similar to the negligence issue in Boning, in foreclosure actions an attorney's justifiable concern with being sued by the opposing party for UDAP could compromise the attorney's ability to zealously represent his or her client.  Consequently, based on the allegations against Rosen, we decline to recognize a UDAP claim against him by Hungate under HRS § 480-2 in the instant foreclosure action.[23]

[23] **We do not now decide whether the 2012 amendments to the foreclosure statute create potential UDAP liability under some circumstances for attorneys conducting nonjudicial foreclosures.** See HRS § 667-60 (2016) (imposing UDAP liability on "any foreclosing mortgagee" for violating a series of provisions governing nonjudicial foreclosure); HRS § 667-1 (2016) (defining "mortgagee" to include "the current mortgagee's or lender's duly authorized agent").

Accordingly, the circuit court properly dismissed Hungate's complaint alleging Rosen violated HRS § 480-2 by engaging in unfair or deceptive acts or practices.

Hungate, 139 Hawaiʻi at 413, 391 P.3d at 20.

In short, Hungate expressly leaves open potential for HRS § 480-2 claims against an attorney, *for example*, if the attorney conducts patently illegal activities on behalf of a client; and the supreme court declined to decide whether the amendments to the nonjudicial foreclosure statute at issue in Hungate create potential HRS chapter 480 liability for attorneys under some circumstances.

Our conclusion that Hungate does not support Attorney Defendants' SLAPP argument is further informed by the supreme court's discussion and rationale for concluding that the former HRS §§ 667-5 and 667-7 did not create a private cause of action against a foreclosing mortgagee's attorney. See Hungate, 139 Hawaiʻi at 405-08, 391 P.3d at 12-15. The supreme court reiterated the factors it considered in determining whether statutory duties give rise to a private cause of action:

> In determining whether a private cause of action should be recognized based on statutory requirements, we consider the following factors: (1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; and (3) whether a private cause of action would be consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff.

Id. at 406, 391 P.3d at 13 (citation and internal quotation marks omitted).

Finally, we note that in the Namahoe Appeal, the supreme court discussed, at some length, the vulnerability of seniors who have taken out reverse mortgages, the legislative intent to combat predatory lending and foreclosure practices, and the expansive legislative and regulatory framework intended to prevent abuse of borrowers like Namahoe and Domingo.  James B. Nutter & Co., 153 Hawaiʻi at 163-64, 528 P.3d at 236-37.

Accordingly, we reject Attorney Defendants' arguments that the Complaint lacks substantial justification under Hawaiʻi law or that the Complaint is solely based on Attorney Defendants' participation before a governmental body.  Therefore, we conclude that the Circuit Court did not err in rejecting Attorney Defendants' arguments that the Complaint should have been dismissed under the anti-SLAPP statute.

B.    The Issues Raised in CAAP-17-0000859

        1.    *Appellate Jurisdiction*

As a threshold matter, Attorney Defendants argue that this court lacks appellate jurisdiction in CAAP-17-0000859 because the Circuit Court erred in entering the Order Granting HRCP Rule 54(b) Certification and the HRCP Rule 54(b) Judgment. Attorney Defendants submit that neither the Order Granting/Denying MPSJ nor the Partial Dismissal Order were eligible for HRCP Rule 54(b) certification.

HRS § 641-1 (2016) sets forth the jurisdiction of this court in civil matters and provides in relevant part:

**§ 641-1 Appeals as of right or interlocutory, civil matters.** (a) Appeals shall be allowed in civil matters from all final judgments, orders, or decrees of circuit and district courts and the land court to the intermediate appellate court, subject to chapter 602.[22]

HRCP Rule 54(b) provides in pertinent part:

> **Judgment upon multiple claims or involving multiple parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

In addition, HRCP Rule 58 requires that "[e]very judgment shall be set forth on a separate document."

On August 2, 2018, this court entered an order raising the issue of appellate jurisdiction, and temporarily remanding the case to the Circuit Court (**Temporary Remand Order**). In the Temporary Remand Order, the court stated, *inter alia*:

> Although Domingo and Namahoe asserted thirteen separate counts against multiple parties in their July 5, 2016 complaint, the [HRCP Rule 54(b) Judgment] purports to enter judgment by merely incorporating the following two interlocutory orders by reference:
>
> (1)    [Partial Dismissal Order], and
>
> (2)    [Order Granting/Denying MPSJ].
>
> The [HRCP Rule 54(b) Judgment] does not specifically identify the parties in favor of whom and against whom the Circuit Court intends to enter judgment. The [HRCP Rule 54(b) Judgment] also does not specifically identify the claim or claims on which the Circuit Court intends to enter judgment. In other words, we cannot determine exactly how the Circuit Court is entering judgment by reading the face of the [HRCP Rule 54(b) Judgment]. Therefore, the [HRCP Rule 54(b) Judgment] does not satisfy the specificity

---

[22]    HRS § 602-57 (2014) provides, in relevant part:

> **§ 602-57 Jurisdiction.** Notwithstanding any other law to the contrary, the intermediate appellate court shall have jurisdiction . . . .
>
>> (1)    To hear and determine appeals from any court or agency when appeals are allowed by law[.]

> requirements for an appealable final judgment under HRS § 641-1(a), HRCP Rule 58, and the holding in Jenkins.

> The Supreme Court of Hawaiʻi now

> > hold[s] that when a party to a circuit court civil case timely appeals a purportedly appealable final judgment later determined not to meet Jenkins requirements, rather than dismiss the appeal, the ICA must temporarily remand the case to the circuit court "in aid of its jurisdiction" pursuant to HRS § 602-57(3) (2016) for entry of an appealable final judgment with a direction to the circuit court to supplement the record on appeal with the final judgment.

> State v. Joshua, 141 Hawaiʻi 91, 93, 405 P.3d 527, 529 (2017) (footnote omitted).  Under the circumstances of the instant case, a temporary remand is necessary under the holding in Joshua for the entry of a judgment that comports with the specificity requirements in Jenkins.

> Therefore, pursuant to HRS § 602-57(3) (2016) and the holding in Joshua, IT IS HEREBY ORDERED AND DECREED as follows:

> 1.   . . . CAAP-17-0000859 is temporarily remanded to the Circuit Court of the Third Circuit in Civil No. 16-1-0249 where, within twenty (20) days after entry of this temporary remand order, the Circuit Court shall

> > (a)   enter a new judgment that amends the [HRCP Rule 54(b) Judgment] by specifically identifying the appropriate parties in favor of whom and against whom the Circuit Court intends to enter judgment, and by specifically identifying the claim or claims on which the Circuit Court intends to enter judgment, or

> > (b)   enter a written explanation as to why it is not possible or appropriate for the Circuit Court to do so.

After further submittals from the parties, on September 4, 2018, the Circuit Court entered:  (1) the Final Judgment Entered Pursuant to the [Partial Dismissal Order] (**2018 Judgment**); and (2) an Explanation as to Why Judgment Is Not Being Entered as to the [Order Granting/Denying MPSJ] (**2018 Explanation**).

In the 2018 Explanation, the Circuit Court concluded that the Order Granting/Denying MPSJ did not dispose of any claim for relief, and therefore, judgment was not being entered

35

thereon. In the absence of a compliant judgment, we lack appellate jurisdiction to review the Order Granting/Denying MPSJ. See generally Jenkins v. Cades Schutte Fleming & Wright, 76 Hawaiʻi 115, 869 P.2d 1334 (1994).

In the 2018 Judgment, as directed by this court, the Circuit Court specifies the parties in favor of and against whom judgment is entered and the claims on which judgment is entered pursuant to the Partial Dismissal Order. Although the 2018 Judgment does not resolve all claims as to all parties, it includes the certification language required under HRCP Rule 54(b) that "there is no just reason for delay." Accordingly, we conclude that we have appellate jurisdiction to review the Partial Dismissal Order.

> 2. *Attorney Defendants' Arguments on the Partial Dismissal Order*

> a. Litigation Privilege

Attorney Defendants argue that Namahoe's claims against them are barred as a matter of law pursuant to the litigation privilege and the supreme court's decision in Hungate. The gravamen of Attorney Defendants' argument is that the litigation privilege operates as an absolute bar against a borrower seeking to sue opposing counsel for counsel's conduct within the scope of representation in a prior foreclosure. They argue, *inter alia*, "Hungate emphatically quashed the last ambiguity that existed for the litigation privilege regarding foreclosure cases" and "the Hawaiʻi Supreme Court has completely shut the door on the ability of a borrower to sue opposing counsel in a foreclosure action."

Under Hawaiʻi law, the litigation privilege is robust, and for good reason, but it is not an absolute bar against an action by a borrower against a foreclosing lender's attorney(s). The reasons for this robust privilege, as discussed in the Hungate passages quoted above, include the attorney's duty to zealously represent his or her client, the lack of a common law duty in favor of an adversary's interest, the strong policy considerations against creating a conflict of interest, the protection of attorney-client counsel and advice from competing concerns, and the vulnerability of an attorney to such suits. See Hungate, 139 Hawaiʻi at 413, 391 P.3d at 20; Matsuura v. E.I. du Pont de Nemours & Co., 102 Hawaiʻi 149, 155-61, 73 P.3d 687, 693-99 (2003) (explaining the policy rationale underlying the litigation privilege);[23] Isobe v. Sakatani, 127 Hawaiʻi 368, 279 P.3d 33 (App. 2012) (applying the attorney's absolute privilege for defamation in judicial proceeding to slander of title claims,

_____

[23]     In Matsuura, the supreme court explained:

> [T]he interrelated policies associated with the litigation privilege include:  (1) promoting the candid, objective, and undistorted disclosure of evidence; (2) placing the burden of testing the evidence upon the litigants during trial; (3) avoiding the chilling effect resulting from the threat of subsequent litigation; (4) reinforcing the finality of judgments; (5) limiting collateral attacks upon judgments; (6) promoting zealous advocacy; (7) discouraging abusive litigation practices; and (8) encouraging settlement. Therefore, in order to determine whether the litigation privilege should bar a subsequent collateral proceeding for civil damages based on litigation misconduct, including fraud, we must first address the policies associated with the privilege.

102 Hawaiʻi at 155, 73 P.3d at 693.

After examining each of these policy considerations in the context of the case, the supreme court concluded that, under Hawaiʻi law, a party was not immunized by the litigation privilege against liability for damages based on fraud engaged in during prior litigation proceedings. Id. at 162, 73 P.3d at 700.  Attorney liability was not at issue.

citing policy reasons); Buscher v. Boning, 114 Hawaiʻi 202, 218-19, 159 P.3d 814, 830-31 (2007) (discussing policy reasons supporting bar to suit against adversary's attorney for negligence and that attorney owed no actionable duty to the opposing party).

That said, none of these cases hold that the litigation privilege provides an absolute bar to claims against the opposing party's attorney for the attorney's actions in judicial foreclosure proceedings. Indeed, as highlighted above, in Hungate the supreme court recognized that attorneys' zealous representation of their clients must be conducted within the bounds of the law, zealous advocacy does not include illegal activities on behalf of clients, and the supreme court would not rule out potential UDAP liability for attorneys in all circumstances other than those at issue in Hungate. 139 Hawaiʻi at 412-13, 391 P.3d at 19-20. In Matsuura, the supreme court stated that the scope of any privilege is based on policy considerations. 102 Hawaiʻi at 155, 73 P.3d at 693. In Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, the supreme court reiterated the conclusion in Matsuura that "'a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings .'" 113 Hawaiʻi 251, 269, 151 P.3d 732, 750 (2007) (quoting Matsuura, 102 Hawaiʻi at 162, 73 P.3d at 700).

In this light, we consider whether the litigation privilege operates as a bar against claims against Attorney Defendants for their fraud on the court in conjunction with the

judicial foreclosure proceedings at issue here.  As directed in
Matsuura, 102 Hawaiʻi at 155, 73 P.3d at 693, we consider the
policies associated with the privilege in such circumstances:

Promoting the candid, objective, and undistorted
disclosure of evidence:  As discussed in Matsuura, the litigation
privilege is based, in part, on an assumption that exposing a
declarant or witness to liability may result in distorted
evidence.  Id.  Here, however, (like the defendants in Matsuura),
Attorney Defendants' conduct was fraudulent and extreme.
Attorney Defendants provided the Circuit Court with an inadequate
and materially misleading HRS § 667-17 attorney affirmation,
which was so egregious that the supreme court in the Namahoe
Appeal concluded that it constituted a fraud on the court.  James
B. Nutter & Co., 153 Hawaiʻi at 167, 528 P.3d at 240.  The
supreme court further held that Namahoe had demonstrated
extraordinary circumstances warranting relief under HRCP Rule
60(b)(6) in that case.  Id. at 170, 528 P.3d at 243.  This
conduct is directly contrary to the policy of promoting the
candid, objective, and undistorted disclosure of evidence.
Accordingly, this policy does not favor limiting liability in a
subsequent proceeding based on commission of a fraud on the court
in a prior proceeding.  See Matsuura, 102 Hawaiʻi at 156, 73 P.3d
at 694.

Placing the burden of testing the evidence upon the
litigants during trial:  The litigation privilege promotes
diligent and timely investigation and testing of the evidence by
the parties, and relatedly, it helps secure the finality of

judgments.  Id.  An attorney's egregious, false, and materially misleading failure to carry out their statutory obligations under HRS § 667-17 frustrates the purpose of the affirmation, but here Namahoe did not diligently and timely test this evidence. Therefore, this policy consideration slightly weighs in favor of limiting liability in subsequent proceedings.

Avoiding the chilling effect resulting from the threat of subsequent litigation:  There is a strong policy in Hawaiʻi against opening the door to subsequent litigation every time someone loses a lawsuit, in large part because it can deter access to justice.  Id. at 157, 73 P.3d at 695.  In most instances, that policy favors limiting liability in subsequent proceedings.  Id.  Here, however, assuming that justiciable claims can ever be brought against an opposing party's attorney for the attorney's commission of a fraud on the court in a prior proceeding, the only avenue for access to justice would be via subsequent litigation.[24]  Thus, under the circumstances here, this policy does not weigh against allowing the subsequent suit.

Reinforcing the finality of judgments:  As discussed in Matsuura, and as demonstrated in the Namahoe Appeal, Hawaiʻi courts favor reaching a judgment on the merits over preserving the finality of a judgment procured by fraud, including fraud on the court.  Matsuura, 102 Hawaiʻi at 157-58, 73 P.3d at 695-96; James B. Nutter & Co., 153 Hawaiʻi at 166-68, 528 P.3d at 239-41. This policy favors permitting relief in a subsequent proceeding

_____

[24]     Any chilling effect of potential subsequent litigation should operate as a deterrent to the commission of fraud on the court in the first instance.

in limited circumstances.  Here, permitting suit against the Attorney Defendants for their fraud on the court in the prior foreclosure proceedings does not directly impact the finality of the prior foreclosure proceedings.  We conclude that when there is an allegation of fraud on the court in prior proceedings, the policy of reinforcing the finality of judgments does not favor limiting liability in a subsequent proceeding.  See Matsuura, 102 Hawaiʼi at 158, 73 P.3d at 696.

Limiting collateral attacks upon judgments:  A collateral attack upon a judgment rendered by a court of competent jurisdiction is strongly disfavored and is permitted only in very limited circumstances, which can include a fraud upon the court.  See id. at 158-59, 73 P.3d at 696-97.  Here, however, a suit against the Attorney Defendants for their fraud on the court in the prior proceedings is not an attack on a judgment entered in favor of their client, and this policy is not implicated.

Promoting zealous advocacy:  Clearly, permitting subsequent suit against a party's attorney could impede this important interest.  However, as the supreme court explained in Matsuura:

> Litigation misconduct that amounts to a fraud on the court directly conflicts with the pursuit of justice and never results from a reasonable advocate's best judgment.  Thus, the policy of promoting zealous advocacy is counterbalanced by the need to adequately punish and discourage such misconduct.  Consequently, the policy of promoting zealous advocacy does not favor limiting liability in subsequent collateral proceedings for fraud.

Id. at 159, 73 P.3d at 697.

We conclude that this rationale is fully applicable here to the subsequent proceedings based upon fraud on the court in the prior proceedings.

Discouraging abusive litigation practices:  As discussed in Matsuura, remedies such as criminal contempt, attorney discipline, and criminal prosecution might act as deterrents to litigation misconduct, but they provide limited means to compensate the victims of such misconduct, and "the existence of these remedies does not oblige us to limit victims of fraud solely to these established remedies, given the nature and effect of fraud."  Id. at 160, 73 P.3d at 698.  Again, we conclude that this rationale is fully applicable to subsequent proceedings based on fraud on the court in the prior proceedings.[25]

The attorney's litigation privilege:  Although not at issue in Matsuura, here, the important policy considerations favoring the protection of attorneys from claims against them for their actions in prior judicial proceedings must be carefully weighed.  We will not recount each of these policy considerations again, but in the vast majority of circumstances, they should and do act as a bar against suit by an opposing party in prior litigation.  However, here, the supreme court has determined that there was a fraud on the court committed by Attorney Defendants through the submission of a legally and factually deficient, inaccurate and incomplete, materially misleading affirmation that

---

[25]    The policy of encouraging settlement, which is discussed in Matsuura, 102 Hawaiʻi at 161, 73 P.3d at 699, is not implicated here.

is mandated by Hawaiʻi statute in order to prevent unwarranted foreclosures. None of the important and substantial policy reasons for shielding an attorney from suit, in the vast majority of circumstances, warrant applying the litigation privilege to bar the victims of such misconduct from seeking a remedy.

Weighing all of the policies underlying the litigation privilege, specifically including the litigation privilege for attorneys, and in light of the supreme court's determination in Matsuura that a party is not immune from liability for damages based upon that party's fraud engaged in during prior proceedings, we hold that an attorney is not immune from liability or civil damages based upon the attorney's own fraud upon the court in prior litigation proceedings.

> b. Damages Based on Attorney Defendants' Fraud on the Court

Attorney Defendants argue that, as a matter of law, fraud on the court is a ground upon which a court may set aside a judgment, but it is not a cause of action for which damages can be awarded. We consider that argument in the context of the fraud on the court at issue here, *i.e.*, Attorney Defendants' legally and factually deficient, inaccurate and incomplete, materially misleading affirmation, which falsely affirmed the sufficiency of the basis of Nutter's foreclosure on the reverse mortgage on Namahoe's home, based on an alleged failure to make a $500 repair, which led to Namahoe being evicted and homeless.

In the Namahoe Appeal, the supreme court explained the legal framework that has been put in place to protect borrowers like Namahoe and Domingo.  It is relevant here, and worth repeating:

> Reverse mortgages are distinct from conventional mortgages both in their function and purpose.  Reverse mortgages, of which home equity conversion mortgages (HECMs) make up a significant portion,[16] are loans that allow senior homeowners to withdraw a portion of their home's equity in the form of cash.  Consumer Financial Protection Bureau, Reverse Mortgages:  Report to Congress 5—6 (June 2012).  This provides seniors with capital to pay for living expenses and other costs, with the loan only reaching maturity when the borrower dies, sells the home or moves out, or fails to maintain the property or pay necessary fees and taxes.  Id. at 5—6, 22; see also HRS § 506-10 (2008) (listing the events that make a reverse mortgage loan due).  This transaction for cash at the expense of ownership of one's home — the largest and most significant asset most Americans possess — has significant ramifications for senior citizens, their families, and the communities in which they live.  Protecting Seniors:  A Review of the FHA's Home Equity Conversion Mortgage (HECM) Program:  Hearing Before the Subcomm. on Housing, Community Development, and Insurance of the H. Comm. on Financial Services, 116th Cong. 2 (2019)  (statement of Rep. Wm. Lacy Clay, Chairman, H. Subcomm. on Hous., Cmty. Dev., and Ins.) ("The racial wealth gap is exacerbated as countless families[, largely racial minorities,] are deprived of the chance to pass on their homes and other property to their children and other heirs, leading to . . . gutted city blocks, and less overall wealth.")
>
> [16]    The mortgage at issue in this case is specifically a home equity conversion mortgage.  HECMs are only available for seniors above 62 years of age who own a property and occupy it as their principal residence.  For consistency with the briefs, circuit court documents, and ICA Memorandum Opinion, this court uses the broader term "reverse mortgage."
>
> Seniors face a significant risk of abuse by lenders, and the consequences of reverse mortgages can be unclear at the time of signing, but disastrous for mortgagors.  See Reverse Mortgages:  Polishing Not Tarnishing the Golden Years:  Hearing Before the Senate Special Comm. on Aging, 110th Cong. 1 (2007) (statement of Senator Herb Kohl, Chairman, Special Comm. on Aging) ("[Reverse mortgage] [a]gents are targeting seniors aggressively in ways that this Committee has seen before:  through direct mail, celebrity endorsements, and free lunch seminars.  Marketers often gloss over the risks of a reverse mortgage, but they convey the pay-off quite clearly."); Sarah B. Mancini & Odette Williamson, Reversing Course:  Stemming the Tide of Reverse Mortgage Foreclosures Through Effective Servicing and Loss Mitigation, 26 Elder L.J. 85, 86—87, 119—20 (2018) ("[o]lder adults who have taken out reverse mortgages are particularly resource-constrained.  They tend to take out these loans as a last resort, motivated by a lack of

sufficient income to cover rising medical costs and other essential expenses."). Namahoe appears to have been targeted in a similar manner; according to his declaration: "some folks came to my door and told me I could obtain a loan and not pay back anything while I lived and resided at the property. I believed them and I obtained what I understand was a reverse mortgage. . . . I spent the money over the years paying bills and buying food."

Due to the significant risks of abuse by lenders and inadequate understanding of reverse mortgage agreements by many senior citizens, reverse mortgages and foreclosures are subject to stringent rules and regulations promulgated by both federal and state authorities. Lenders offering loans backed by HUD, of which reverse mortgages and HECMs are one type, are required to make reasonable efforts to conduct face-to-face interviews with delinquent mortgagors, 24 C.F.R. § 203.604 (2009), conduct loss mitigation efforts to cure defaults, 24 C.F.R. §§ 203.605 (2009) and 203.501 (2009), conduct pre-foreclosure review, 24 C.F.R. § 203.606 (2009), and facilitate reinstatement of the mortgage, 24 C.F.R. § 203.608 (2009). Failure to comply with these regulations may result in civil penalties or the withdrawal of a mortgagee's HUD approval. 24 C.F.R. § 203.500 (2009).

Our state legislature has also acted to combat predatory lending in the context of reverse mortgages. Lenders are required to refer borrowers to HUD-approved counselors, and must be presented with a signed certification confirming that the borrower has received counseling prior to accepting an application for a reverse mortgage loan. HRS § 506-10.

Further, in the aftermath of economic crash and foreclosure crisis in the early-2010s, the legislature passed HRS § 667-17. The language of the attorney affirmation even refers to the conditions that gave rise to the statute:

> During and after August 2010, numerous and widespread insufficiencies in foreclosure filings in various courts around the nation were reported . . ., including failure to review documents and files to establish standing and other foreclosure requisites; filing of notarized affidavits that falsely attest to such review and to other critical facts in the foreclosure process; and "robosignature" of documents.

HRS § 667-17.

Importantly for [the Namahoe Appeal,] [*as well as this appeal now before the ICA*], HRS § 667-17 requires attorneys filing on behalf of mortgagees seeking foreclosure to sign and submit an affirmation that the attorney has verified the accuracy of filed documents, and confirm that the lender has an adequate factual and legal basis for pursuing foreclosure.[17] As officers of the court, attorneys for mortgagees seeking foreclosure must affirm not only the accuracy of the factual allegations underlying foreclosure, but also the legal sufficiency of foreclosure claims.[18] Id. Attorneys are also under a "continuing obligation to amend" the affirmation in the event of newly discovered material facts after filing. Id.

[17] HRS § 667-17 states, "[a]ny attorney who files on behalf of a mortgagee seeking to foreclose on a residential property under this part shall sign and submit an affirmation that the attorney has verified the accuracy of the documents submitted, under penalty of perjury and subject to applicable rules of professional conduct." HRS § 667-17.

[18] One of the form affirmations in § 667-17 states:

> Based upon my communication with [the foreclosing entity], as well as upon my own inspection and other reasonable inquiry under the circumstances, I affirm that, to the best of my knowledge, information, and belief, the Summons, Complaint, and other papers filed or submitted to the Court in this matter contain no false statements of fact or law and that plaintiff has legal standing to bring this foreclosure action.

It is within this expansive legislative and regulatory framework that [Nutter] and its attorneys at Clay Chapman pursued foreclosure on Namahoe's only home — all on the basis of a $500.00 repair obligation.

James B. Nutter & Co., 153 Hawaiʻi at 163-64, 528 P.3d at 236-37 (emphasis omitted).

This framework is critical here because the supreme court has also held:

> In determining whether a private cause of action should be recognized based on statutory requirements, we consider the following factors: (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; and (3) whether a private cause of action would be "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff."

Whitey's Boat Cruises, Inc. v. Napali-Kauai Boat Charters, Inc., 110 Hawaiʻi 302, 312, 132 P.3d 1213, 1223 (2006).

In Hungate, the supreme court considered these factors in determining whether certain former provisions of the nonjudicial foreclosure statute, including the former HRS § 667-5, created a private cause of action against a mortgagee's attorney. 139 Hawaiʻi at 406-07, 391 P.3d at 13-14. Hungate, as a party in breach of a mortgage contract, fell within the class

46

for whom the statute was enacted. Id. at 406, 391 P.3d at 13. As to the second factor, the statute was silent as to whether the legislature intended to create a private cause of action. Id. Turning to whether a private right of action would be consistent with the underlying purpose, the supreme court emphasized:

> [A] close reading of the legislative history of the 2008 amendment shows it was enacted to set additional burdens on the mortgagee to protect the mortgagor; the statute was not amended to regulate attorneys representing mortgagees. The amendment's structure or scheme attempted "to streamline and ensure transparency in the non-judicial foreclosure process by requiring a foreclosure mortgagee to provide pertinent information regarding the property to' interested parties."

Id. at 407, 391 P.3d at 14 (citation omitted).

Although the legislature tapped Hawaii-based attorneys to provide useful information that could be obtained locally, the supreme court reiterated that "the underlying structure and intent of the amendment was to enable interested parties to request and receive information in a timely manner from mortgagees, and not to regulate attorneys' conduct." Id. In addition, the Hungate court considered whether additional remedies were unnecessary to protect the interests of the borrower in light of the available remedies against the lender, *i.e.*, a claim for wrongful foreclosure. Id. Based on these factors, the supreme court concluded that recognizing a cause of action against a lender's attorney based on the former HRS § 667-5 was not warranted.

We turn to HRS § 667-17 (Supp. 2012) (repealed 2017), and the broader statutory framework enacted to combat predatory lending and foreclosure practices related to reverse mortgages. Vulnerable, elderly borrowers such as Namahoe and Domingo are

47

certainly among the class of persons for whose special benefit the statute was enacted.  See James B. Nutter & Co., 153 Hawaiʻi at 163-64, 528 P.3d at 236-37.  Thus, the first Whitey's Boat factor is met.

The second factor looks for any indication of legislative intent, explicit or implicit, to create or deny a remedy against the attorney responsible for communicating with a lender's representative, conducting reasonable inquiry, verifying the accuracy of documents, and submitting an affirmation with the court.  Unlike the statute examined in Hungate, HRS § 667-17 was plainly and specifically enacted to put additional burdens on the foreclosing attorney, not his or her mortgagee client.[26]  The

---

[26]     HRS § 667-17 provided, in pertinent part:

**§ 667-17  Attorney affirmation in judicial foreclosure.**  Any attorney who files on behalf of a mortgagee seeking to foreclose on a residential property under this part shall sign and submit an affirmation that the attorney has verified the accuracy of the documents submitted, under penalty of perjury and subject to applicable rules of professional conduct.  The affirmation shall be filed with the court at the time that the action is commenced and shall be in substantially the following form:

. . . .

*Note:  During and after August 2010, numerous and widespread insufficiencies in foreclosure filings in various courts around the nation were reported by major mortgage lenders and other authorities, including failure to review documents and files to establish standing and other foreclosure requisites; filing of notarized affidavits that falsely attest to such review and to other critical facts in the foreclosure process; and "robosignature" of documents.*

[_____], Esq., pursuant to Hawaii Revised Statutes § 667-17 and under the penalties of perjury, affirms as follows:
1.       I am an attorney at law duly licensed to practice in the State of Hawaii and am affiliated with the Law Firm of _____, the attorneys of record for Plaintiff in the above-captioned mortgage foreclosure action.  As such, I am fully aware of the

(continued...)

substantially-required form included a recitation regarding widespread insufficiencies in foreclosure filings and specifically called out false attestations regarding the review of documents and critical facts. The statute does not explicitly create or deny a remedy for failure to comply with its mandate, and the legislative history states that the purpose of the legislation is "to prevent unwarranted foreclosure." H. Stand. Comm. Rep. No. 697-14, in 2014 House Journal, at 1127. Thus, this is a neutral factor.

---

[26](...continued)
> underlying action, as well as the proceedings had herein.
>
> 2. On [date], I communicated with the following representative or representatives of Plaintiff, who informed me that he/she/they (a) personally reviewed plaintiff's documents and records relating to this case for factual accuracy; and (b) confirmed the factual accuracy of the allegations set forth in the Complaint and any supporting affidavits or affirmations filed with the Court, as well as the accuracy of the notarizations contained in the supporting documents filed therewith.
>
> Name                                    Title
> _____        _____
> _____        _____
> _____        _____
>
> 3. Based upon my communication with [persons specified in item 2], as well as upon my own inspection and other reasonable inquiry under the circumstances, I affirm that, to the best of my knowledge, information, and belief, the Summons, Complaint, and other papers filed or submitted to the Court in this matter contain no false statements of fact or law and that plaintiff has legal standing to bring this foreclosure action. I understand my continuing obligation to amend this Affirmation in light of newly discovered material facts following its filing.
>
> 4. I am aware of my obligations under Hawaii Rules of Professional Conduct.
>
> _____
> DATED:
>
> *N.B.: Counsel may augment this affirmation to provide explanatory details, and may file supplemental affirmations or affidavits for the same purpose.*
>
> (Bold emphasis added).

The third factor to be examined is whether a private cause of action would be consistent with the underlying purposes of the legislative scheme. Under the language of the statute and the legislative scheme here, it is palpably clear that the legislature did not view additional duties and remedies directed solely at foreclosing mortgagees as sufficient to stem the tide of wrongful foreclosures. HRS § 667-17 was directed at foreclosing attorneys. Recognizing a private cause of action against attorneys for committing a fraud on the court through an egregious, legally and factually deficient, inaccurate and incomplete, materially false and misleading HRS § 667-17 affirmation, particularly with respect to a foreclosure on a reverse mortgage, would be consistent with the purposes of the legislative scheme at issue here.[27]

Finally, we consider the additional factor weighed by the supreme court in Hungate, that is, whether additional remedies are unnecessary, as we determine whether to recognize a cause of action against attorneys for committing a fraud on the court through an egregious, legally and factually deficient, inaccurate and incomplete, materially false and misleading HRS § 667-17 affirmation, particularly with respect to a foreclosure on a reverse mortgage. Arguably, an additional cause of action against attorneys was not strictly necessary to protect the interests of the mortgagor because the mortgagor can file a claim against the mortgagee for wrongful foreclosure. See Hungate, 139

---

[27] This analysis is intended to be construed narrowly and should not be construed to be applicable to a non-material or less egregious failure to comply with HRS § 667-17.

Hawaiʻi at 407, 391 P.3d at 14. Yet, the whole purpose of HRS § 667-17 was to provide stringent, additional safeguards and failsafes, to be carried out by foreclosing attorneys, to address the plague of wrongful foreclosures, particularly against vulnerable members of our community. The existence of other remedies does not preclude an additional remedy against a Hawaiʻi-licensed attorney who not only fails to comply with the statute, but who commits a fraud on the court by submitting a materially false HRS § 667-17 affirmation. See Matsuura, 102 Hawaiʻi at 160, 73 P.3d at 698. Here, we hold that the weighing of these factors favors recognition of a cause of action against attorneys for committing a fraud on the court through an egregious, legally and factually deficient, inaccurate and incomplete, materially false and misleading HRS § 667-17 affirmation, with respect to a foreclosure on a reverse mortgage.

C. Attorney Defendants' Rule 12(b)(6) Motion to Dismiss

In their first point of error in *CAAP-17-0000859*, Plaintiffs contend that in the Partial Dismissal Order, the Circuit Court erred in granting in part Attorney Defendants' HRCP Rule 12(b)(6) Motion to Dismiss. In the Complaint, Plaintiffs asserted 13 counts, including the following against the Attorney Defendants: Count I, Legal Malpractice; Count II, Gross Legal Malpractice; Count III, Breach of Fiduciary Duty; Count IV, Wrongful Foreclosure; Count V, IIED; Count VI, UDAP Claims; Count VII, Abuse of Process; Count VIII, Fraud, including fraud on the court; Count X, Elder Abuse; Count XII, Slander of Title; and Count XIII, Punitive Damages. After briefing and a September 29,

2016 hearing, the Circuit Court dismissed all of Domingo's claims against Attorney Defendants, and dismissed all of Namahoe's claims except the fraud on the court claim.[28]

It is well-established that:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. The appellate court must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory. For this reason, in reviewing a circuit court's order dismissing a complaint . . . the appellate court's consideration is strictly limited to the allegations of the complaint, and the appellate court must deem those allegations to be true.

Kealoha v. Machado, 131 Hawaiʻi 62, 74, 315 P.3d 213, 225 (2013) (citation and brackets omitted); see also Bank of Am., N.A. v. Reyes-Toledo, 143 Hawaiʻi 249, 257-63, 428 P.3d 761, 769-75 (2018) (**Reyes-Toledo II**) (discussing standards applicable to HRCP Rule 12(b)(6) motions to dismiss).

Our review is conducted accordingly.

1.  *Counts I and II - Legal Malpractice Claims*

It is undisputed that Plaintiffs were not in an attorney-client relationship with Attorney Defendants; in fact, Attorney Defendants represented Plaintiffs' litigation adversary. As previously held by the ICA, as well as the supreme court:

> [C]reation of a duty in favor of an adversary of the attorney's client would create an unacceptable conflict of interest. Not only would the adversary's interests interfere with the client's interests, the attorney's justifiable concern with being sued for negligence would

---

[28]  Count XII, Slander of Title, was dismissed with prejudice. All of the other dismissals were without prejudice.

> detrimentally interfere with the attorney-client
> relationship.

Myers v. Cohen, 5 Haw. App. 232, 246, 687 P.2d 6, 16 (1984) (citations omitted), reversed on other grounds by 67 Haw. 688 P.2d 1145 (1984); see also Buscher, 114 Hawaiʻi at 220, 159 P.3d at 832).

In Blair v. Ing, 95 Hawaiʻi 247, 253-63, 21 P.3d 452, 458-68 (2001), the supreme court examined the legal theories underlying legal malpractice claims and the various reasons that other jurisdictions have created narrow exceptions to the general rule disallowing a legal malpractice action by a non-client against an attorney based on either a negligence or third-party beneficiary (contract-based) claim.[29] While the entire discussion is illuminating and informs our decision here, the bottom line is that under Hawaiʻi law, legal malpractice is viewed as a hybrid of tort and contract, permitting claims to proceed under either negligence or contract theories of recovery, and "[t]he class of individuals who may bring a malpractice action is limited to a client's intended beneficiaries, provided no other remedy exists to prevent future harm." Id. at 258, 259, 261, 21 P.3d at 463, 464, 466; see also Buscher, 114 Hawaiʻi at 220, 159 P.2d at 831 (reiterating that the Blair holding did not create a duty of care to all non-client beneficiaries).

---

[29] The starting place for this discussion was a nineteeth century United States Supreme Court case that held "a third party not in privity of contract with an attorney may not maintain a legal malpractice action against an attorney for negligence absent fraud or collusion." Blair, 95 Hawaiʻi at 253, 21 P.3d at 458 (citing Nat'l Sav. Bank v. Ward, 100 U.S. 195, 205-06 (1879)).

We decline to expand the narrow conditions in which a non-client can bring a legal malpractice action to the circumstances here.  Clearly, foreclosure defendants are not intended beneficiaries of the legal services an attorney is contracted to provide to his or her lender clients.  The sound policies against creating conflicts of interests are particularly germane in the context of adversaries in litigation proceedings.

In addition, other remedies exist to address the alleged harm and any future harm.  Perhaps most important here is the well-recognized principle noted in Buscher:

> Unlike a claim [by a non-client against an attorney] for negligence, an attorney can be held liable for fraudulent misrepresentation.  See Kahala Royal Corp., 113 Hawaiʻi at 268–69, 151 P.3d at 749–50 (citing caselaw from other jurisdictions stating that it is well settled that an attorney can be sued by an adverse party for fraud); Matsuura v. E.I. du Pont, 102 Hawaiʻi 149, 162, 73 P.3d 687, 700 (2003) ("Under Hawaiʻi law, a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings."); Giuliani v. Chuck, 1 Haw. App. 379, 383–84, 620 P.2d 733, 736–37 (1980) ("The rule of law that an attorney representing a client may be held personally liable to an adverse party or a third person who sustains injury as a result of an attorney's intentional tortious acts is well settled." (Citations omitted.)).

Buscher, 114 Hawaiʻi at 220 n.13, 159 P.3d at 833 n.13.

In Kahala Royal Corp., the supreme court pointed to a California case that stated:

> [A] fraud claim against a lawyer is no different from a fraud claim against anyone else.  If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability.  While an attorney's professional duty of care extends only to his own client and intended beneficiaries of his legal work, the limitations on liability for negligence do not apply to liability for fraud.

113 Hawaiʻi at 269, 151 P.3d at 750 (citing Vega v. Jones, Day, Reavis & Pogue, 121 Cal.App.4th 282, 17 Cal.Rptr.3d 26, 31–35 (2004)) (citation form altered).

54

For these reasons, we conclude that the Circuit Court did not err in dismissing Plaintiffs' legal malpractice claims against Attorney Defendants.

2.    *Count III - Breach of Fiduciary Duty*

To prove a breach of fiduciary duty, Plaintiffs must show that a fiduciary relationship existed between them and Attorney Defendants, Attorney Defendants breached a fiduciary duty to Plaintiffs, and the breach proximately caused injury to the Plaintiffs.  See 37 C.J.S. Fraud § 15 (2023) (elements of cause of action for breach of fiduciary duty); Cochrane v. Azman, No. 29562, 2001 WL 661714, *5 (Haw. App. Feb. 22, 2011) (mem. op.).  A fiduciary duty exists when there is a relationship of trust and confidence.  Meheula v. Hausten, 29 Haw. 304, 314 (Haw. Terr. 1926).

Plaintiffs make no argument that a relationship of trust and confidence existed between them and Attorney Defendants, instead arguing that HRS § 667-17 supports the existence of a statutory duty owed by attorneys under the circumstances here.  We addressed the issue of whether a cause of action should be recognized based on the requirements of HRS § 667-17 in conjunction with Attorney Defendants' cross-appeal from the Partial Dismissal Order.  However, viewing the Complaint in the light most favorable to Plaintiffs, it appears beyond doubt that Plaintiffs can prove no set of facts supporting that a relationship of trust and confidence exists between them and Attorney Defendants.  Therefore, we conclude that the Circuit

Court did not err in dismissing Plaintiffs' claim for breach of fiduciary duty.

   3.   *Counts IV, V, X & XII - Litigation Privilege*

   Plaintiffs argue that the Circuit Court erred in dismissing Counts IV (Wrongful Foreclosure), V (IIED), X (Elder Abuse), and XII (Slander of Title) as to Attorney Defendants based on the litigation privilege.  In the HRCP Rule 12(b)(6) motion filed in the Circuit Court, Attorney Defendants cited, *inter alia*, Kahala Royal Corp. for the proposition that the litigation privilege is generally applicable to bar a claim for damages against the opposing party's attorney if the alleged acts occurred in the course of the prior litigation.  Attorney Defendants argued that the allegations pertaining to Counts IV, V, X, and XII "are limited to conduct that occurred in the scope of the Attorney Defendants' representation of [Nutter]," and therefore, they are barred by the litigation privilege.[30]

   In the Partial Dismissal Order, the Circuit Court reviewed the policy considerations underlying the litigation privilege, which were set forth in Matsuura, wherein the supreme court explained that

>    the interrelated policies associated with the litigation privilege include:  (1) promoting the candid, objective, and undistorted disclosure of evidence; (2) placing the burden of testing the evidence upon the litigants during trial; (3) avoiding the chilling effect resulting from the threat of subsequent litigation; (4) reinforcing the finality of judgments; (5) limiting collateral attacks upon judgments; (6) promoting zealous advocacy; (7) discouraging abusive litigation practices; and (8) encouraging settlement.  Therefore, in order to determine whether the litigation privilege should bar a subsequent collateral proceeding for

---

   [30]   Attorney Defendants argue that the litigation privilege also bars Counts I, II, and III.  However, as we have already concluded that the Circuit Court did not err in dismissing those counts, we need not address them further.

> civil damages based on litigation misconduct, including fraud, we must first address the policies associated with the privilege.

102 Hawai'i at 155, 73 P.3d at 693.

The Circuit Court noted that the litigation privilege applies when statements were made or conduct was undertaken in judicial proceedings, but that certain claims for relief are clearly not covered, such as abuse of process and malicious prosecution.  The Circuit Court explained its dismissal without prejudice of Counts IV, V, and X based on the litigation privilege as follows:

> Case law does not expressly except the claims contained in the counts from the application of the litigation privilege.  Also, there is no allegation that [Attorney Defendants] acted with a specific desire to harm Plaintiffs or acted for the purpose of personal gain or with ill will toward Plaintiffs.  Accordingly, Counts IV, V, and X are dismissed without prejudice.

We first consider Count IV (Wrongful Foreclosure).  Under Hawai'i jurisprudence, a mortgagor can bring a wrongful judicial foreclosure claim against a mortgagee, even when no foreclosure or sale has yet occurred, if the foreclosing mortgagee had no right to foreclosure at the time the foreclosure proceedings were commenced, and the mortgagor suffered an injury in fact and damages as a result.  Reyes-Toledo II, 143 Hawai'i at 263-64, 428 P.3d at 775-76.  The wrongful act in the wrongful foreclosure is the lender's attempt, for its own benefit, to foreclose the borrower's rights, title, and interest in the property being foreclosed upon without a lawful basis for doing so.  See generally id.  No Hawai'i case has recognized a wrongful foreclosure cause of action against the lender's attorney.

As discussed above, in Hungate the supreme court recognized the *generally* unacceptable policy implications of creating a cause of action against a lender's attorney in favor of an adverse party, so long as the attorney's actions were within the bounds of the law. Hungate, 139 Hawaiʻi at 412-13, 391 P.3d at 19-20. In Hungate, the supreme court declined to permit Hungate to sue the lender's attorney for, *inter alia*, UDAP under HRS § 480-2 in the foreclosure action because allowing a UDAP claim could compromise the attorney's zealous representation of his or her client. Id. at 413, 391 P.3d at 20. In addition, the court noted that an attorney is particularly vulnerable to such suit because, under HRS § 480-2 a plaintiff need only allege that the attorney's actions had a capacity to deceive, rather than meeting a more rigorous state of mind, such as actual deception. Id. Broadly recognizing a wrongful foreclosure cause of action against attorneys poses similar pitfalls. A wrongful foreclosure claim can be brought, regardless of a lender's state of mind, if the lender cannot establish that it had the right to proceed at the commencement of the foreclosure proceedings, and the borrower-defendant suffered injuries and damages as a result. See Reyes-Toledo II, 143 Hawaiʻi at 263-64, 428 P.3d at 775-76.

To allow a parallel wrongful foreclosure claim against the lender's attorney in every case wherein the lender's right to sue might be at issue could severely compromise the attorney's ability to zealously represent lender clients. To impose liability on an attorney for wrongful foreclosure would have the undesirable effect of creating a duty to third parties that might

take precedence over the attorney's duty to his or her client. Thus, we conclude that the supreme court's policy concerns disfavor recognizing a wrongful foreclosure cause of action against a lender's attorney. In most circumstances, the mortgagor's interests can be protected from the wrongful acts of the mortgagee through filing a claim against the mortgagee, without permitting a wrongful foreclosure claim against the lender's attorney. Hungate, 139 Hawaiʻi at 412, 391 P.3d at 19. We further conclude that, while a wrongful foreclosure claim *per se* should not be permitted against the lender's attorney, based on the policy considerations underlying the litigation privilege, certain wrongful-foreclosure-related claims may lie against the attorney for the attorney's own wrongful conduct in certain circumstances, as discussed in the context of Plaintiffs' fraud on the court claims against Attorney Defendants.

Accordingly, even accepting the allegations of the Complaint as true and viewing the Complaint in a light most favorable to Plaintiffs, we conclude that the Circuit Court did not err in dismissing the wrongful foreclosure claims against Attorney Defendants.

The Circuit Court also dismissed without prejudice Count V, IIED, purportedly based on the Attorney Defendants' litigation privilege, but further stating that "there is no allegation that [Attorney Defendants] acted with a specific desire to harm Plaintiffs or acted for the purpose of personal gain or with ill will toward Plaintiffs." Thus, it appears that dismissal of Count V was on alternative grounds of litigation

privilege and failure to state a claim for IIED.  The supreme court has held:

> The elements of the tort of IIED are:  1) that the conduct allegedly causing the harm was intentional or reckless; 2) that the conduct was outrageous; and 3) that the conduct caused 4) extreme emotional distress to another. <u>Hac v. Univ. of Hawaii</u>, 102 Hawaiʻi 92, 106-07, 73 P.3d 46, 60-61 (2003).  "The term 'outrageous' has been construed to mean without just cause or excuse and beyond all bounds of decency."  <u>Enoka v. AIG Hawaiʻi Ins. Co., Inc.</u>, 109 Hawaiʻi 537, 559, 128 P.3d 850, 872 (2006) (citations and some internal quotation marks omitted).  Additionally, "[t]he question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first instance, although where reasonable people may differ on that question it should be left to the jury."  <u>Young v. Allstate Ins. Co.</u>, 119 Hawaiʻi 403, 429, 198 P.3d 666, 692 (2008) (citation omitted).

<u>Goran Pleho, LLC v. Lacy</u>, 144 Hawaiʻi 224, 237, 439 P.3d 176, 189 (2019).

The allegations of the Complaint include, *inter alia*, the following.  Namahoe was "knowingly, purposely [sic], wrongfully, fraudulently, conspiratorially, and criminally expelled" from his home via a wrongful foreclosure.  Attorney Defendants filed multiple reverse mortgage foreclosures while representing Nutter against elderly mortgagors, including the foreclosures against Domingo and Namahoe, to further Nutter's wrongful, tortious, illegal, and criminal conduct toward Domingo and Namahoe in the foreclosure actions, with various degrees of culpability including, for example, knowing (or they should have known) that Nutter had no right to foreclose under the circumstances.  Attorney Defendants refused to agree to a HUD inspection of the completed repairs by Domingo, while admitting that a HUD inspection was determinative of the issue of whether repairs were satisfactory.  After service of a writ of ejectment on Namahoe, in order to cover-up and further defraud Namahoe,

Attorney Defendants (and Nutter) offered Namahoe $5,000 to sign a paper Namahoe did not understand, under extreme duress. Newly homeless, Namahoe took the $5,000, used it to purchase a van to live in, and Namahoe was left unhoused, helpless, ill, depressed, shamed, and physically, emotionally, and psychologically impaired for life.

With respect to Domingo, the Complaint additionally alleges the following. Even after judgment was entered in favor of Domingo in the Domingo Foreclosure Action, Attorney Defendants (and/or Nutter) notified Domingo, without advising Domingo's attorney, that Domingo remained in default for $6,674, and if he did not enter into a repayment agreement, a new foreclosure action would be filed. Domingo was frightened, fatigued, frail, feeble and impaired when he signed a Repayment Plan Agreement under duress, fear, and serious emotional distress caused by the continued threat of baseless foreclosure.

Taking these allegations as true for the purposes of evaluating the dismissal of Plaintiffs' IIED claims under HRCP Rule 12(b)(6), we cannot say that Namahoe and Domingo have failed to state claims for IIED. See Goran Pleho, LLC, 144 Hawaiʻi at 238, 439 P.3d at 190.

Turning to the question of whether the litigation privilege bars the IIED claims at issue in this case, Attorney Defendants argue that the litigation privilege has been held to bar other intentional tort claims, pointing to Kahala Royal Corp., 113 Hawaiʻi at 269-73, 151 P.3d at 750-54, which applied the litigation privilege to bar claims of intentional

interference with contractual relations (**IICR**) and intentional interference with prospective economic advantage (**IIPEA**) for conduct occurring during the course of the attorney's representation of his or her client.  In so doing, the supreme court noted that the complainants failed to allege that the attorney defendants were acting outside of the scope of their attorney-client relationship, and they failed to allege facts from which actual malice might reasonably said to exist.  Id. at 271, 151 P.3d at 752.  Accordingly, the supreme court concluded that there were no allegations indicating that the attorneys "possessed a desire to harm which is independent of the desire to protect their clients."  Id. (citation omitted).  The supreme court further concluded that there were no allegations that the attorneys were acting for personal gain or with ill will toward the opposing party.  Id.

Similarly, in the case at bar, Plaintiffs do not allege attorney defendants were acting outside of the scope of their attorney-client relationship, they do not allege facts from which actual malice might reasonably be said to exist,[31] and they do not allege that Attorney Defendants acted for personal gain or with ill-will toward Plaintiffs.  Attorney Defendants' alleged conduct occurred during and in conjunction with their representation of Nutter in judicial foreclosure proceedings.

---

[31]    Actual malice was not an element of either the IICR or IIPEA claims at issue in Kahala Royal Corp.  Kahala Royal Corp., 113 Hawaiʻi at 267 n.17 & n.18, 151 P.3d at 748 n.17 & n.18 (setting forth the elements of IICR and IIPEA).  However, the supreme court's litigation privilege analysis embraced cases from other jurisdictions that have held that the privilege is lost only if the attorney acts with bad faith, personal ill-will, malice, or actual intent to harm.  Id. at 270-72, 151 P.3d at 751-53.

Thus, based on the allegations of the Complaint, we conclude that the Circuit Court did not err in dismissing Plaintiffs' IIED based on the litigation privilege.

Count X (Elder Abuse) asserts that Attorney Defendants (and Nutter) wrongfully appropriated and/or assisted in appropriating Plaintiffs' residences with the intent to defraud, they knew or should have known that Plaintiffs had the right to retain ownership of their residences, and that this conduct constituted elder abuse. It is unclear, and the parties have not addressed, whether Hawaiʻi recognizes a cause of action for elder abuse (and what elements must be established), although additional civil penalties may be imposed in a government action for a violation of HRS § 480-2 that is "directed toward, targets or injures an elder." HRS § 480-13.5 (2008). However, Plaintiffs' Elder Abuse claims were dismissed based on Attorney Defendants' litigation privilege on an HRCP Rule 12(b)(6) motion, and we confine our review to that issue.[32]

We accept Plaintiffs' allegations as true and view them in the light most favorable to plaintiff, including the allegation that Attorney Defendants' intended to defraud them out of their residences. As stated above, in Kahala Royal Corp., the supreme court pointed favorably to a California case that stated:

> [A] fraud claim against a lawyer is no different from a fraud claim against anyone else. If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability. While an attorney's professional duty of care extends only to his own client and intended beneficiaries of his legal work, the limitations on

_____

[32] We do not reach the question of whether an elder abuse claim lies in Hawaiʻi.

> liability for negligence do not apply to liability for fraud.

13 Hawaiʻi at 269, 151 P.3d at 750 (citing <u>Vega v. Jones, Day, Reavis & Pogue</u>, 121 Cal.App.4th 282, 17 Cal.Rptr.3d 26, 31–35 (2004)) (citation form altered).

While Count X may ultimately be found to be otherwise infirm, applying the standards applicable to a review of dismissal on an HRCP Rule 12(b)(6) motion, we cannot conclude that the litigation privilege shields Attorney Defendants from defending a claim that they intentionally acted to defraud these elderly Plaintiffs out of their homes. Accordingly, we conclude that the Circuit Court erred in dismissing Count X on this basis.

Finally, the Circuit Court dismissed Count XII, Slander of Title, on the ground that the litigation privilege expressly applies to slander of title claims, based on this court's decision in <u>Isobe</u>, 127 Hawaiʻi at 368, 279 P.3d at 33. In <u>Isobe</u>, we held that an absolute litigation privilege applies to claims for slander of title. <u>Id.</u> at 383, 279 P.3d at 48. Here, Plaintiffs' claim for slander of title against Attorney Defendants is based on the filing of a Notice of Pendency of Action (**NOPA**) with respect to both the Domingo Foreclosure and the Namahoe Foreclosure. The NOPAs were filed in the course of judicial proceedings and were related to those proceedings. Therefore, based on <u>Isobe</u>, we conclude that the Circuit Court did not err in dismissing Plaintiffs' slander of title claims in Count XII with prejudice.

4.    *Count VII - Abuse of Process*

Plaintiffs argue that the Circuit Court erred in dismissing without prejudice Count VII for failure to state a claim for abuse of process.  Count VII states:

> 57.    Plaintiffs Domingo and Namahoe re-allege and re-state the allegations of paragraphs 1-56 above.
>
> 58.    [Nutter and Attorney Defendants] initiated the Namahoe Foreclosure for a measly $500.00 worth of cosmetic repairs that had been completed, but not approved by a HUD inspector and never disclosed to the Court.
>
> 59.    [Nutter and Attorney Defendants] initiated the Domingo Foreclosure for the improper purpose of an inspection of Domingo's residence by Nutter's inspectors and appraisers rather than a HUD approved inspector, to which Nutter vehemently objected.
>
> 60.    [Nutter and Attorney Defendants] insidiously devised the strategy to foreclose reverse mortgages with repair riders, targeting the impaired, marginal, and improverished elderly who are unaware of the HUD inspection requirement to satisfy the repair rider and also unaware foreclosure was never a remedy per the loan documents and HUD regulations, rules and standard practices.
>
> 61.    The acts and omissions of [Nutter and Attorney Defendants] alleged herein and such other conduct as may be established at trial, constitute abuse of process.

(Format altered).

The Circuit Court dismissed Plaintiffs' claims for abuse of process based on Young v. Allstate Ins. Co., 119 Hawaiʻi 403, 198 P.3d 666 (2008).  In Young, the supreme court reiterated that "there are two essential elements in a claim for abuse of process:  (1) an ulterior purpose and (2) a wilful act in the use of the process which is not proper in the regular conduct of the proceeding."  Id. at 412, 198 P.3d at 675 (citation and internal quotation marks omitted).  With respect to the second element, the supreme court emphasized that the defendant must be alleged to have committed a willful act that is not proper in the regular

65

conduct of the proceeding.  Id.  The willful act alleged in

Young, using lowball settlement offers to punish the claimant in

that case and "send a message" to other claimants, did not

satisfy the second element because offers to settle are "proper"

in the regular conduct of proceedings.  Id. at 414-15, 198 P.3d

at 677-78.  Noting that the only other willful act alleged was

the use of process itself, the supreme court pointed to the

following:

> The most recent edition of Professor Prosser's treatise on
> torts teaches that "[s]ome definite act or threat not
> authorized by the process, or aimed at an objective not
> legitimate in the use of the process, is required; and there
> is no liability where the defendant has done nothing more
> than carry out the process to its authorized conclusion,
> even though with bad intentions."  Prosser and Keeton on
> Torts § 121, at 898 (5th ed., W. Page Keeton et al. eds.,
> 1984) (emphases added) (footnotes omitted).  Thus, more is
> required than the issuance of the process itself.  See
> Coleman, 41 Cal.3d at 802, 718 P.2d at 89, 226 Cal.Rptr. at
> 101-02, Simone v. Golden Nugget Hotel & Casino, 844 F.2d
> 1031, 1038, 1040 (3d Cir. 1988) (applying New Jersey law);
> Clermont Environmental Reclamation Co. v. Hancock, 16 Ohio
> App.3d 9, 474 N.E.2d 357, 361 (1984); Kaminske v. Wisconsin
> Cent. Ltd., 102 F.Supp.2d 1066, 1078-79 (E.D.Wis. 2000).

Young, 119 Hawaiʻi at 414-15, 198 P.3d at 677-78 (footnote

omitted; emphasis altered).

Here, the Circuit Court's dismissal without prejudice

of Plaintiffs' abuse of process claims rested on the second

element, and the court's determination that there was no

allegation that Attorney Defendants committed a willful act

distinct from the use of process.  On appeal, Plaintiffs argue

that the willful act committed by Attorney Defendants was the act

of filing the foreclosure complaints knowing that Nutter had no

right to proceed in the first place, and proceeding in the

Namahoe Foreclosure despite the fact that documents mailed to

Namahoe were returned.  As in Young, while Plaintiffs'

allegations satisfied the first element of an abuse of process claim, the Complaint did not allege the type of improper act upon which a claim of abuse of process may be founded. Therefore, we conclude that the Circuit Court did not err in dismissing Count VII without prejudice.

> 5. *Count VIII - Fraud*

Plaintiffs argue that the Circuit Court erred in dismissing Domingo and Namahoe's fraud claims, except for Namahoe's fraud on the court claims. Count VIII states:

> 62. Plaintiffs re-allege and re-state the allegations of paragraphs 1-61 above.
>
> 63. The acts and omissions of [Nutter and Attorney Defendants] alleged herein and such other conduct as may be established at trial, constitute clear and convincing evidence of fraud practiced upon Plaintiffs.

In the Partial Dismissal Order, the Circuit Court dismissed Count VIII, in relevant part as follows:

> To the extent that the claims for relief seek recovery of damages and they are based upon violations of HRS § 667-17, consistent with the discussion in Subsection A[33] they are dismissed.
>
> In regard to [Domingo's] claim for relief for fraud based upon the Repayment Agreement, it does not have the requisite specificity required by Rule 9 of the HRCP and Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 30-31 (1992). Of particular concern, the element of detrimental reliance is not clearly articulated. Also, in light of the allegation that the Repayment Agreement has been rescinded, it is not clear what substantial pecuniary damage was suffered by [Domingo]. See Ellis v. Crockett, 51 Haw. 45, 52-53 (1969).

---

[33] In Subsection A of the Partial Dismissal Order, *inter alia*, the Circuit Court rejected Plaintiffs' argument that a claim for damages may be brought against Attorney Defendants pursuant to HRS § 667-17. The Circuit Court reasoned that attorney affirmations are directed at the court, and that sanctions and other remedies might be available as a result of misrepresentations to the court, but that no direct cause of action against Attorney Defendants was permissible. We did not reach this issue in conjunction with our review of the Circuit Court's dismissal of Counts I, II, and III of the Complaint, as the Circuit Court did. However, it is discussed in conjunction with our review of Attorney Defendants' appeal.

> Regarding [Namahoe's] claim for relief for fraud based on paragraphs 18, 19 and 20, [Namahoe] characterizes it as a fraud on the court.
>
> Plaintiffs' claims for relief for damages based upon fraud are dismissed without prejudice. [Namahoe's] claim for relief for fraud on the court is not dismissed.

On appeal, Plaintiffs argue that the fraud claims were sufficient to withstand dismissal under HRCP Rule 12(b)(6), particularly since the facts must be deemed as true. Plaintiffs further argue that the essence of their fraud claim against Attorney Defendants was based on HRS § 667-17, and Attorney Defendants' materially false and misleading HRS § 667-17 affirmations. As we held above, applying the standards set forth in the supreme court's jurisprudence, an action for damages is hereby recognized in Hawaiʻi against an attorney for committing a fraud on the court through an egregious, legally and factually deficient, inaccurate and incomplete, materially false and misleading HRS § 667-17 affirmation under the circumstance of this case, which involves wrongful foreclosures on Plaintiffs' reverse mortgages.

Thus, we conclude that the Circuit Court erred in dismissing Plaintiffs' fraud claims to the extent that they seek a recovery of damages based upon the egregious violations of HRS § 667-17 that are alleged in this case, which have been held to constitute fraud on the court. See James B. Nutter & Co., 153 Hawaiʻi at 166-69, 528 P.3d at 239-42.

Plaintiffs argue that its allegations of fraud are stated with the required particularity. They submit that, in addition to Attorney Defendants' materially deficient and misleading HRS § 667-17 affirmations, the claim for fraud was

based on the failure to amend the necessary affirmations, the law and facts particular to reverse mortgages and the HUD rules and regulations applicable thereto, as well as Attorney Defendants' further actions in seeking summary judgment against Domingo and Namahoe in the foreclosure suits.  It seems, however, based on the allegations of the complaint, that these allegations are part of the fraud on the court claim grounded in HRS § 667-17.

As discussed above, we have recognized a cause of action against attorneys arising out of a fraud on the court through an egregious, legally and factually deficient, inaccurate and incomplete, materially false and misleading HRS § 667-17 affirmation under the circumstances of this case, which involved foreclosure on the Plaintiffs' reverse mortgages.  On remand, both Plaintiffs are able to seek damages from Attorney Defendants for their injuries and losses caused by such egregious misconduct.  However, Plaintiffs' assertion that there were additional, independent fraudulent acts and/or omissions is unclear, and Plaintiffs do not point to any specific additional fraud.  We therefore conclude that the Circuit Court did not err in dismissing such additional fraud claims without prejudice.

6.   *Count VI - Unfair or Deceptive Acts or Practices*

Plaintiffs contend that the Circuit Court erred in dismissing their UDAP Claims on the grounds that they do not have standing as consumers to sue Attorney Defendants under HRS chapters 480 and 481A.  The Circuit Court's ruling on Count VI states, in relevant part:

> HRS § 480-2(d) states:  "[n]o person other than a consumer, the attorney general or the dirctor of the office

of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section." Under HRS § 480-1, "'[c]onsumer' means a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." Under the allegations of the Complaint, Plaintiffs did not receive or pursue legal services from [Attorney Defendants]. Therefore, the claims for relief under Chapter 480, HRS, should be dismissed.

Regarding Plaintiffs' claims for relief under Chapter 481A, HRS, Plaintiffs contend that they relate to the likelihood of Plaintiffs' confusion or misunderstanding. Under Hawaiʻi law, a:

likelihood of confusion exists when consumers confronted with products or services bearing one label or mark would be likely to assume that the source of the products or services is the same as or associated with the source of a different product or service identified by a similar mark. (Citation omitted)

Carrington v. Sears, Roebuck & Co., 5 Haw. App. 194, 199 (1984).

The point is that a claim under Chapter 481A, HRS, relates to the sale or provision of goods or services. In this case, [Attorney Defendants] may have provided legal services, but not to Plaintiffs. Plaintiffs do not have standing to bring an action against [Attorney Defendants] under Chapter 481A, HRS.

Plaintiffs' claims for relief based upon Chapters 480 and 481A are dismissed without prejudice.

On appeal, Plaintiffs argue that, even though Attorney Defendants did not provide legal services to them, they are third-party beneficiaries of the protections afforded by the HRS § 667-17 affirmation obligations/duties. We have already recognized a direct cause of action against attorneys arising out of a fraud on the court through an egregious, legally and factually deficient, inaccurate and incomplete, materially false and misleading HRS § 667-17 affirmation under the circumstances of this case. It is unclear how Plaintiffs' argument concerning

third-party beneficiary status under HRS § 667-17 entitles them to further relief under the UDAP statutes.[34]

As Attorney Defendants point out, in <u>Hungate</u> the supreme court declined to recognize a UDAP claim against the lender's attorney, although the court stated:  "[a]s Hungate asserts, he is a consumer based on the mortgage with Deutsche Bank, and is thus also a 'consumer *vis à vis* the mortgagee's lawyer for the same transaction.'"  <u>Hungate</u>, 139 Hawaiʻi at 412, 391 P.3d at 19; <u>see</u> <u>also</u> HRS § 480-1 (defining "consumer").  The supreme court examined the unique nature of the attorney-client relationship, and with respect to UDAP claims the court stated:

> Permitting a party to sue his or her opponent's attorney for UDAP under HRS § 480-2 in foreclosure actions presents a similar issue in that an attorney's concern with being sued by a party opponent could compromise his or her representation of the client.  In a UDAP action, an attorney would be especially vulnerable to suit because, for example, under HRS § 480-2 actual deception need not be shown; the capacity to deceive is sufficient.  Accordingly, a plaintiff would need only to allege that opposing counsel has breached the statutory duty under HRS § 480-2 not to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in a way that caused private damages in order to state a claim under HRS chapter 480.  Given that UDAP lacks a more rigorous or precise state of mind requirement, even a carefully rendered opinion could, if incorrect, have the capacity to deceive.  The attorney would therefore have to insure the correctness of his [or her] opinions and strategies, rendering it virtually impossible for an attorney to effectively perform the traditional role of legal counselor.  Similar to the negligence issue in <u>Boning</u>, in foreclosure actions an attorney's justifiable concern with being sued by the opposing party for UDAP could compromise the attorney's ability to zealously represent his or her client.  Consequently, based on the allegations against Rosen, we decline to recognize a UDAP claim against him by Hungate under HRS § 480-2 in the instant foreclosure action.

---

[34]    Plaintiffs cite no authority for the proposition that they have rights as a third-party beneficiary of a statute, as opposed to a third-party beneficiary of a contract.  As discussed above, we have rejected the argument that an adverse party is a third-party beneficiary of the legal services contract between their litigation adversary and their adversary's attorney.

<u>Id.</u> at 413, 391 P.3d at 20 (citations and footnote omitted; punctuation altered).

Although Domingo and Namahoe are consumers based on their reverse mortgages with Nutter, and thus are consumers *vis à vis* Attorney Defendants, the supreme court's rationale for declining to recognize a UDAP claim against the lender's attorney in <u>Hungate</u> is equally applicable to Plaintiffs' Chapters 480 and 481A Claims against Attorney Defendants here.[35]  Thus, we affirm the Circuit Court's dismissal of Count VI without prejudice, on this alternative ground.

      7.   *Count XIII - Punitive Damages*

Plaintiffs argue that the Circuit Court erred in dismissing their claims for punitive damages on the basis that it had dismissed the other tort claims against Attorney Defendants. In light of our conclusion that Plaintiffs may prosecute claims in the nature of fraud for Attorney Defendants' fraud on the court, the Circuit Court erred to the extent that it barred Plaintiffs' pursuit of punitive damages, which was set forth in the Complaint's prayer for relief, as well as in Count XIII. However, "a claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action."

---

[35]    In <u>Hungate</u>, the supreme court did not decide whether attorneys could be held liable under HRS § 667-60 (2016), which imposes UDAP liability on certain foreclosing mortgagees in nonjudicial foreclosures.  139 Hawai'i at 413 n.23, 391 P.3d at 20 n.23.  We similarly are not addressing other potential arguments; rather, we are applying <u>Hungate</u>'s holding to the allegations of the Complaint in this case.  We further note that we have examined the majority opinion in <u>Goran Pleho, LLC</u>, which held that <u>Hungate</u>'s holding concerning UDAP claims against opposing counsel did not apply because the issue in that case was whether a lawyer who engaged in unfair or deceptive practices against his own client was subject to civil liability under HRS § 480-2, and we conclude that <u>Goran Pleho, LLC</u> does not affect the application of <u>Hungate</u> to this case.  <u>Goran Pleho, LLC</u>, 144 Hawai'i at 245-52, 439 P.3d at 197-203.

<u>Ross v. Stouffer Hotel Co. (Haw.), Inc.</u>, 76 Hawaiʻi 454, 466, 879 P.2d 1037, 1049 (1994) (citation omitted). Thus, on this alternative ground, we conclude that the Circuit Court did not err in dismissing Count XIII as a separate cause of action.

D.  <u>Plaintiffs' Partial Summary Judgment Motion</u>

As discussed in Section IV.B.1. above, we lack appellate jurisdiction to review the Order Granting/Denying MPSJ. Therefore, we do not reach Plaintiffs' arguments on their second point of error in CAAP-17-0000859.

V.  <u>CONCLUSION</u>

As set forth above, Nutter's appeal in *CAAP-17-0000324* was dismissed with prejudice. With respect to Attorney Defendants' cross-appeal, we conclude that Plaintiffs' Complaint does not constitute a SLAPP and thus affirm the Circuit Court's Order Denying Attorney Defendants' MJOP, as well as the Order Denying Attorney Defendants' Substantive Joinder to the Nutter MJOP.

In *CAAP-17-0000859*, the appeal from the Order Granting/Denying MPSJ is dismissed for lack of appellate jurisdiction. For the reasons stated herein, the Partial Dismissal Order is affirmed in part and vacated in part; the Circuit Court's dismissal of Counts I, II, III, IV, V, VI, VII, and XIII without prejudice is affirmed; the Circuit Court's dismissal of Count XII with prejudice is affirmed; the Circuit Court's dismissal of Plaintiffs' fraud claims in Count VIII to the extent that they seek a recovery based upon the egregious violations of HRS § 667-17 that are alleged in this case is

vacated, but the Circuit Court's dismissal without prejudice of Plaintiffs' fraud claims other than fraud on the court is otherwise affirmed; the Circuit Court's dismissal of Count X is vacated.

This case is remanded to the Circuit Court for further proceedings consistent with this Opinion.

On the briefs:

David J. Minkin,
Jesse J.T. Smith,
(McCorriston Miller Mukai
 MacKinnon LLP),
for Defendant-Appellant/
 Cross-Appellee/Appellee.

William J. Rosdil, AAL,
      and
Rebecca A. Copeland,
(Law Office of Rebecca A.
  Copeland, LLC),
for Plaintiffs-Appellees/
 Cross-Appellees/Appellants.

A. Bernard Bays,
Matthew C. Shannon,
(Bays Lung Rose & Holmas),
for Defendants-Appellees/
 Cross-Appellants.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Karen T. Nakasone
Associate Judge